297 A.2d 342.

TOWN OF NORTH KINGSTOWN *et al. vs.* THE NORTH KINGSTOWN TEACHERS ASSOCIATION.

NOVEMBER 30, 1972

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

JOSLIN, J. This dispute arose under the School Teachers' Arbitration Act [G. L. 1956 (1968 Reenactment) ch. 9.3 of title 28]. A Superior Court justice certified it to this court

for hearing and determination on an agreed statement of facts.

It appears that the School Committee of the Town of North Kingstown and the North Kingstown Teachers Association, bargaining agent for the certified teachers in that town's public school system, met for the purpose of determining what terms and conditions of employment for the school year 1971-72[1] should be included in a proposed collective bargaining agreement.

When an impasse in negotiations developed, the unresolved issues were submitted to arbitration pursuant to §28-9.3-9. Included in the submission were association proposals for an agency shop, course reimbursement and longevity pay. Plaintiffs, being dissatisfied with the arbitrators' decision thereon, sought judicial review. Initially they filed a complaint in the Superior Court;[2] they then moved that the case be certified to this court for hearing and determination on an agreed statement of facts. The case arrived here under a consent order which certifies three stated questions for our determination.

At the outset we are constrained to comment on the method employed to bring the case to this court. In *Nunes* v. *Town of Bristol*, 102 R. I. 729, 731, 232 A.2d 775, 777 (1967), we described similar procedures as "hybrid" and "unorthodox." They evidenced there, as they do here, a lack of appreciation for the differences between certifying

---

[1]Questions concerning the validity and enforceability of collective bargaining agreements for an expired school year would ordinarily be moot, *see Town of Scituate* v. *Scituate Teachers' Ass'n,* 110 R. I. 679, 296 A.2d 466 (1972). Those presented in this case are not, inasmuch as the record here, unlike that in the *Town of Scituate* case, has been supplemented by the parties' agreement that the identical legal questions which exist with respect to the 1971-72 agreement apply equally to the presently operative agreement.

[2]The association has not raised the question of whether the Superior Court's jurisdiction was properly invoked, and we do not do so sua sponte.

an action for hearing and determination on an agreed statement of facts, as provided for in G. L. 1956 (1969 Reenactment) §9-24-25, and certifying questions of doubt and importance pursuant to §9-24-27. Commenting on those differences, Professor Kent observes "* * * that certification under this section [§9-24-25] is of the entire action for determination by the Supreme Court, as contrasted with certification of a question of importance by the Superior Court pursuant to G. L. 1956, §9-24-27, wherein only the question certified is answered, leaving decision of the action to the trial court." 1 Kent, *R. I. Civ. Prac.* §72.3 at 502-03.

Those who ignore these legislatively prescribed procedures run the risk that the certification may go unanswered. It is only because the issue in controversy here, as in *Nunes,* is of "extreme public interest" that we are persuaded to act otherwise. Our failure to reject the certification should not, however, be deemed precedential.

We consider the case, then, as if it were properly certified on an agreed statement of facts. In that frame of reference, the issue is whether the arbitrators acted in excess of their jurisdiction with respect to three of the unresolved issues submitted to them.

The first of those issues relates to the arbitrators' authority to order execution of a collective bargaining agreement embodying a provision for what is known in the field of labor relations as an "agency shop." In general, such a provision requires a charge or fee to be paid to a certified labor organization by those employees who, although not members of that organization, are nonetheless part of the collective bargaining unit for which it, as bargaining agent, speaks. In this case, the arbitrators directed the parties "to write" language into their agreement which would give "full effect" to that portion of their award which states:

" * * * prior to the first payday in October, all teachers as a condition of employment would have to have paid to the Association dues or a sum equal to dues in the united profession. Such an arrangement does not require membership in the Association, it only requires that dues or an amount equal to dues be paid by all teachers in order to hold employment in the North Kingstown School System."

That directive's legality becomes suspect because of possible conflict between it and the right-to-work provision of the School Teachers' Arbitration Act (§28-9.3-7) which guarantees public school teachers the freedom "* * * to join *or to decline to join* any association or organization regardless of whether it has been certified as the exclusive representative of certified public school teachers." (emphasis added)

The plaintiffs argue that the two provisions are completely at odds. They rely upon the judgment of the Supreme Court that an agency shop conditions employment "upon the practical equivalent of union 'membership.' "[3] *NLRB* v. *General Motors Corp.*, 373 U. S. 734, 743, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670, 676 (1963). It is unthinkable to them that our Legislature would grant teachers freedom to choose whether or not to affiliate with a labor organization, and simultaneously compel those who opt against joining to pay that organization a "sum equal to [union] dues" in order to obtain or hold employment.

The defendant, on the other hand, sees nothing incongruous between the two. It argues that the legislators who en-

---

[3] In *NLRB* v. *General Motors Corp.*, 373 U. S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), the Court held that the National Labor Relations Act does not prohibit inclusion of an agency shop clause in a collective bargaining agreement covering employment in a state having a right-to-work law. In the companion case of *Retail Clerks, Local 1625, AFL-CIO* v. *Schermerhorn,* 373 U. S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963), it was held that the question of whether such an arrangement violated Florida law was for the Florida court to decide.

acted the School Teachers' Arbitration Act in 1966 must certainly have been aware that several states had by then enacted "right-to-work laws"; that while some of those laws were silent on whether nonunion members of a bargaining unit could be compelled to contribute to the union, most were restrictive and specifically prohibited the exaction of union dues or other fees from those nonmembers; and that the failure of our Legislature to pattern our act upon the more restrictive models clearly evidences its intention to allow, rather than to ban, the agency shop as a permissible form of union security arrangement.[4]

This approach finds support in *Meade Elec. Co.* v. *Hagberg,* 129 Ind. App. 631, 159 N.E.2d 408 (1959) where it was employed as a rationale for recognizing the legality of an agency shop. It is further aided by the rule of strict construction.[5] Application of that rule in this instance justifies the conclusion that the Legislature, by failing to abrogate, either specifically or by clear implication, the common law right of labor and management to include an agency shop clause in a collective bargaining agreement, is presumed not to have intended a change in that law. Hopfl, *The Agency Shop Question* 49 Cornell L.Q. 478, 483 (1964).

---

[4]Among the states then having constitutional or statutory right-to-work provisions specifically banning the agency shop were: Alabama, Arkansas, Georgia, Iowa, Louisiana, Mississippi, Nebraska, North Carolina, South Carolina, Tennessee, Utah, Virginia and Wyoming. A typical provision was Ga. Code Anno. §54-903 (Rev. ed. 1961) which read as follows:

"No individual shall be required as a condition of employment, or of continuance of employment, to pay any fee, assessment, or other sum of money whatsoever, to a labor organization."

[5]In this state we follow the rule that statutes in derogation of the common law should be strictly construed. *Hodge* v. *Osteopathic Gen. Hosp.,* 107 R. I. 135, 144, 265 A.2d 733, 738-39 (1970); *Pucci* v. *Algiere,* 106 R. I. 411, 420-21, 261 A.2d 1, 7 (1970); *Atlantic Ref. Co.* v. *Director of Pub. Works,* 104 R. I. 436, 441, 244 A.2d 853, 856 (1968).

Decisions elsewhere, however, reject these arguments and, in what apparently is the majority view, hold that a right-to-work law, even though lacking a specific prohibition against taxation of nonunion members, will not tolerate an agency shop. *Higgins* v. *Cardinal Mfg. Co.*, 188 Kan. 11, 360 P.2d 456 (1961); *Baldwin* v. *Arizona Flame Restaurant, Inc.*, 82 Ariz. 385, 313 P.2d 759 (1957); *Schermerhorn* v. *Local 1625, Retail Clerks, AFL-CIO*, 141 So.2d 269 (Fla. 1962).

What underlies those decisions is the concept that legislation which "* * * clearly bestows on the workingman a right to join or not join a labor union, as he sees fit, without jeopardizing his job" must of necessity be repugnant to a contract stipulation which "* * * requires the nonunion employee to purchase from the labor union a right * * *" which the right-to-work law has given him. *Schermerhorn* v. *Local 1625, Retail Clerks, AFL-CIO*, *supra* at 272-73. They rest also on the notion that "the real and rather well-hidden meaning" of a right-to-work law's ban on compulsory unionism includes by necessary implication a prohibition against any forced payment by a worker to a labor organization as the price for obtaining or holding employment. *Higgins* v. *Cardinal Mfg. Co.*, *supra* at 23, 360 P.2d at 465.

The plaintiffs advance two further arguments in support of the position that it was illegal for the arbitrators to require an agency shop provision to be embodied in this agreement.

The first of those arguments declares that we must assume that the Legislature intended to ban the agency shop, inasmuch as a contrary assumption would subvert the purpose of the tenure laws which in G. L. 1956 (1969 Reenactment) §16-13-3 make "good and just cause" the only

ground for dismissing a tenured teacher.[6]  The short answer is that the Legislature which established grounds for dismissal can also provide that noncompliance with an agency shop provision will constitute one of those grounds.

In their other and final argument, plaintiffs, in substance, observe that the School Teachers' Arbitration Act declares this state's public policy as affording public school teachers the rights to organize, to be represented, to negotiate professionally, and to bargain on a collective basis; that in similar declarations the Firefighters' and the Policemen's Arbitration Acts extend to firemen and policemen in §28-9.1-2 and §28-9.2-2, respectively, *"* * * all of the rights of labor* other than the right to strike, or engage in any work stoppage or slowdown." (emphasis added)  The differences, plaintiffs say, are significant, and they argue that the more restrictive declaration of teachers' rights evidences a legislative intent to invalidate the agency shop as a union security arrangement.  That argument, while perhaps ingenious, is nonetheless speculative for the differences on which they rely as a premise in nowise support their conclusion.

We have adverted sufficiently to the arguments pro and con to make it apparent that for each which points to a possible legislative intention, there is a satisfactory counter pointing to an opposite intention.  This is understandably so because nothing either in the language of the Act, or in the report of the legislative commission[7] preceding its enactment, even hints at an attitudinal approach.  Neither is there anything in the objectives which the Act was

[6]The challenged portion of the award excepts "tenured teachers presently in the system" from the agency shop provision, and we are, therefore, not concerned with problems which might arise had they not been so excluded.

[7]Report of Commission to Study Mediation and Arbitration as authorized in R. I. Acts and Resolves 1300-02 (1965).

designed to serve or in the circumstances attendant upon its enactment from which a legislative intention can be ascertained. Instead, there is nothing but obscurity. It is as if there were a complete lack of awareness that there might someday be a proposal to include an agency shop provision in a labor agreement.

As we cannot extract meaning from an intention cloaked in obscurity, we must legislate "between gaps" and fill "the open spaces in the law." Cardozo, *The Nature of the Judicial Process* 113 (1921). We are guided in that task by considerations "* * * exactly of the same nature as those which ought to dominate legislative action itself, since it is a question in each case, of satisfying, as best may be, justice and social utility by an appropriate rule." *Id.* at 120. This, Judge Jerome Frank said, is "an activity which, no matter how one may label it, is in part legislative." *Guiseppi* v. *Walling,* 144 F.2d 608, 621 (2d Cir. 1944), *aff'd sub nom. Gemsco, Inc.* v. *Walling,* 324 U. S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945).

In evaluating those considerations which in our judgment would be likely to prompt legislative action, foremost is the argument that a certified labor organization, as sole bargaining agent for all employees in the bargaining unit, is bound by law to negotiate for both union and nonunion members; that the negotiations are costly; that it would be manifestly inequitable to permit those who see fit not to join the union to benefit from its services without at the same time requiring them to bear a fair and just share of the financial burdens; and that no member of a bargaining unit, be he a joiner or a nonjoiner, should expect or be allowed a "free-ride."

Because this argument is persuasive on the general question of the legitimacy of the agency shop does not mean that it is similarly convincing with respect to the validity of a provision calling for nonunion members to pay more

than a just portion of the costs of the benefits conferred upon them. To accept such a provision as valid would, in effect, sanction an inverse "free-rider" situation in which the union member, rather than the nonjoiner, would be the "free-rider."

Accordingly, our approval is expressly limited to that kind of agency shop provision which neither requires a nonjoiner to share in expenditures for benefits he is not entitled to receive, nor exacts from him more than a proportionate share of the costs of securing the benefits conferred upon all members of the bargaining unit. An agency shop provision thus limited has been recognized both judicially[8] and at the bargaining table.[9] The accounting problems which may result from its use, although perhaps burdensome, should not be impossible. Hopfl, 49 Cornell L.Q., supra at 480.

It now remains to be decided whether or not the arbitrators exceeded their statutory authority by awarding (1) longevity increases of $200 and $400 for teachers with 15 and 25 years' service, respectively; and (2) reimbursement for some of the costs of tuition, textbooks and travel in-

---

[8]In *Nagy* v. *City of Detroit*, Wayne County No. 123-642, 60 CCH Lab. Cas. 66,958 (Mich. Cir., April 23, 1969) the court said:

"It could be that thorough consideration might be given to the specific amount of contribution required under the agency shop provisions so that a non-union member would be making his fair contribution, only to the actual cost of the bargaining and the contract administration and not to the additional costs of other union expenses or activities which bear no relation to the services rendered and in which he plays no part or has no voice." *Id.* at 66,960.

[9]In *New Jersey Turnpike Employees, Local 194, AFL-CIO* v. *New Jersey Turnpike Authority*, 117 N. J. Super. 349, 284 A.2d 566 (1971), it is reported that the union proposal required "* * * monthly payment by non-members of the union of *their respective fair share of the cost* of collective negotiations, processing of grievances and other activities related to union representation, as a condition of employment." (emphasis added)

curred by teachers satisfactorily completing courses for graduate credit.

Briefly stated, plaintiffs' contention is that this part of the award calls for establishment of a plan for the payment of bonuses, a subject which they assert is outside the scope of those matters upon which §28-9.3-2 obligated them to bargain. This may well be so. The issue, however, is not whether payment of a bonus is a mandatory subject for collective bargaining, but whether course reimbursement and longevity increments are matters which, at least initially, have to do with "salary" within the contemplation of §28-9.3-2. If they do, clearly they were matters eligible for consideration at the bargaining table.

What then is the meaning of the word "salary" as used in the Act? Certainly, it should, at least for present purposes, be deemed as inclusive as the word "wages" in the comparable provision of the National Labor Relations Act. 29 U.S.C.A. §159(a) (1965). That word "* * * embraces within its meaning direct and immediate economic benefits flowing from the employment relationship." *W. W. Cross & Co. v. NLRB,* 174 F.2d 875, 878 (1st Cir. 1949). We need go no further for surely that construction is sufficiently comprehensive to encompass the longevity increments and course reimbursements awarded in this case.

The papers in the case, with our decision endorsed thereon, are ordered sent back to the Superior Court for entry of judgment in accordance with said decision.

*Coffey, Ward, McGovern & Novogroski, Arthur Novogroski, John G. Coffey, Jr.,* for plaintiffs.

*Natale L. Urso,* for defendant.