Merrimack
No. 6986
No. 6987

### THE STATE EMPLOYEES' ASSOCIATION OF NEW HAMPSHIRE, INC.

v.

### EUGENE S. MILLS, ACTING PRESIDENT, UNIVERSITY OF NEW HAMPSHIRE, & a.

August 29, 1975

*Cleveland, Waters & Bass* and *Robert T. Clark (Mr. Clark* orally) for the plaintiff.

*Devine, Millimet, Stahl & Branch* and *Luke S. O'Neill, Jr. (Mr. O'Neill* orally) for the defendants.

DUNCAN, J. The plaintiff State Employees' Association, representing the nonacademic employees of Keene State College and Plymouth State College, brought these companion petitions for injunctive and declaratory relief against the acting president of the University of New Hampshire, the trustees of the university, and the members of the negotiating team, so-called, of Keene State College, and Plymouth State College, respectively. They sought temporary relief, and a determination of whether the defendants have bargained in good faith with the plaintiff, as required by RSA 98-C:5 (Supp. 1973); as well as definition of the scope of bargaining required by RSA ch. 98-C (1964), as amended.

Temporary orders were entered by the Superior Court (*Loughlin*, J.) on June 28, 1974, and July 11, 1974. By stipulation of the parties dated July 25, 1974, these orders were dissolved, and it was agreed that grievance procedures in effect prior to expiration of an agreement dated May 27, 1972, shall remain in force; that plaintiff will be notified of any changes to be instituted in the following areas, "all of which are disputed as comprising 'conditions of employment' [within the meaning of RSA ch. 98-C (Supp. 1973)]: (i) wages; (ii) health, hospitalization, and group life insurance benefits; (iii) retirement benefits"; and that the court will retain jurisdiction over the matters set forth. Thereupon a decree in accordance with the stipulation was entered, and all questions of law arising on the pleadings were reserved and transferred under RSA 491:17 (1968) by *Batchelder*, J.

The statute involved (RSA ch. 98-C (Supp. 1973)) has since been repealed by Laws 1975, 490:4, effective December 21, 1975, and together with RSA ch. 105-B (Supp. 1973) will be replaced by Laws 1975, 490:2, establishing RSA ch. 273-A, effective August 23, 1975. Laws 1975, 490:6. Section 3 of the 1975 Act provides that any "collective bargaining agreement in existence on the effective date of this chapter" shall not be terminated or modified by the chapter.

The basic dispute presented by the pleadings relates to whether the statute requires negotiation by the parties with respect to the three areas of "money matters" specified in the stipulation of the parties quoted above. Other disputed areas relate to binding arbitration, and negotiation with respect to an "agency shop".

The governing statute, "An Act to Improve Management-Employee Relations in State Employment", now RSA ch. 98-C (Supp. 1973), was adopted in 1969. Laws 1969, ch. 290. It defined

an "Employee organization", which in this case is the plaintiff association, as an association "having as a primary purpose the improvement of working conditions among employees", including classified employees of the state, and nonacademic employees of the university. RSA 98-C:1 I, II (Supp. 1973). Keene State College and Plymouth State College are designated as units "for purposes of representation and collective bargaining" and the president of the university is made "chief executive officer" of these units since they include nonacademic employees. RSA 98-C:1 V, VII (Supp. 1973). Under RSA 98-C:5 (Supp. 1973), the chief executive officer or his representatives are required to meet with representatives of the employee organization "upon request, and to bargain in good faith for the purpose of reaching agreement upon the terms of an agreement as provided in section 4".

Thus the bargaining in these cases has been between representatives of the plaintiff and of the defendant as acting president of the university.

The basic nature and scope of agreements which may be bargained for, so far as defined by RSA ch. 98-C (Supp. 1973), are specified in section 4 of the act, as amended by Laws 1970, 41:5, as follows: "I. The chief executive officer of a unit is empowered to negotiate and enter into a written agreement for a term not exceeding five years with a certified and recognized employee organization as to the conditions of employment of employees in the unit, which may, without being limited thereto, include provisions — (a) Establishing lawful procedures and steps for adjustment of grievances and disputes relating to conditions of employment, provided that the settlement thereof is not incompatible with law. (b) Establishing lawful procedures and steps for conferring upon and considering recommendations for improvements in personnel policies and changes in classifications and allocations. (c) Establishing lawful procedures and steps for arbitration of grievances and disputes relating to conditions of employment, which cannot be adjusted by agreement; the decision of the arbitrator or arbitrators to be final and binding on the parties unless it is incompatible with existing law or regulation or requires an appropriation of additional funds, in which case it shall be only advisory in nature. (d) Establishing lawful procedures and steps for mediation or fact-finding to assist in the negotiation of an agreement in succession to one which is about to or has expired which provisions shall survive the term of the agreement. II. Every such agreement shall contain a no-strike clause which shall survive the

term of the agreement and remain in effect until a new agreement is negotiated covering the same employees. No such agreement shall infringe upon the rights of individual employees under RSA 98 and the regulations issued pursuant thereto. In the case of nonacademic employees of the University of New Hampshire, no such agreement shall infringe upon the rights of the individual employees and the policies governing such employees as established by the board of trustees of the University of New Hampshire and administrative regulations issued by it. Such agreement shall at all times be subject to existing or future laws and all valid regulations adopted pursuant thereto. Every such proposed agreement shall be approved as to form and legality by the attorney general or his deputy or assistant prior to its execution."

A fundamental disagreement, as previously indicated, relates to the proper interpretation of the expression "agreement . . . as to the conditions of employment of employees in the unit", and the expression "conditions of employment" as repeated in the provisions of section 4. It is the contention of the plaintiff that "conditions of employment" include (1) wages, inclusive of a basic salary schedule, a cost of living clause, a reclassification adjustment clause, provision for promotion and merit increases, and retirement, and life and medical insurance benefits; (2) a union security clause including an agency shop; and (3) provisions as to renegotiation, covering duration, reopening negotiations, mediations, and binding arbitration clauses.

The first issue presented is whether the statute required the defendants to negotiate agreements with respect to the so-called "money matters" including basic wages, and retirement and insurance benefits. A number of factors lead us to the conclusion that it did not.

While the phrases "conditions of employment", standing alone, might be considered to embrace the financial terms upon which employees are hired, other provisions of the statute point to the opposite conclusion. At the outset it may be noted that while the federal statute, (and numerous state statutes) refer to "wages, hours, and other terms and conditions of employment" (Labor Management Relations Act, 29 U.S.C.A. § 158 (d) (1970)), RSA 98-C:4 (Supp. 1973) utilized only the three concluding words of the expression, omitting "wages, hours, and other terms". *See* Edwards, *The Emerging Duty to Bargain in the Public Sector,* 71 Mich. L. Rev. 885 (1973). RSA 98-C:1 II (Supp. 1973) defined the plaintiff organization in terms of an association having as a primary

purpose "the improvement of *working conditions*". (Emphasis added.)

Additionally, the specific examples of "conditions" with respect to which negotiations "may" be conducted, as recited in RSA 98-C:4 (Supp. 1973), consist of "procedures and steps for adjustment of grievances ... relating to conditions of employment, provided ... not incompatible with law" (para. (a)); procedures for "arbitration of [such] grievances" to be "binding" only where not "incompatible with existing law" or not requiring appropriation of funds, in which latter cases arbitrator's decisions "shall be only advisory in nature" (para. (c)); procedure for "conferring upon" and "considering" recommendations as to personnel policies and changes in classifications (para. (b)); and procedures for "mediation" to "assist in the negotiation" of succeeding agreements on termination of existing agreements (para. (d)). Plainly these express examples do not contemplate agreements with respect to wages, or any binding agreement relative to personnel policies. The omission of any reference to wages or "terms" of employment is significant.

Of some significance also are the provisions of RSA 98-C:4 II (Supp. 1973) inserted by amendment in 1970 (Laws 1970, 41:5), referred to as the "non-infringement clause": "In the case of nonacademic employees of the university of New Hampshire, no such agreement shall infringe upon the rights of the individual employees and the policies governing such employees as established by the board of trustees of the university of New Hampshire and administrative regulations issued by it." Incorporated by this amendment also was the provision guaranteeing the rights of nonacademic employees to have the "views" of the plaintiff presented to the university president and board of trustees, through the defendants. RSA 98-C:2 (Supp. 1973).

Directly related to the noninfringement clause quoted above and its guarantee against infringement upon the "policies governing [nonacademic] employees as established by the board of trustees of the university" is the original provision of RSA 98-C:4 II (Supp. 1973) that: "Such agreement shall at all times be subject to existing or future laws and all valid regulations adopted pursuant thereto." Among the "existing laws" embraced by this provision was RSA 187:8 (1964) vesting in the university trustees the "management and control of all the property and affairs of ... the Keene state college and the Plymouth state college" and by subsection 8 IX the power "to authorize the use [of the income of the

state colleges] in such manner as the trustees may determine . . . ."
*See* Laws 1963, 303:9, :10.

Our review of pertinent statutory provisions does not lead us to the conclusion that the legislature by enacting RSA ch. 98-C (Supp. 1973) intended to authorize "collective bargaining" in the sense in which that term is employed in the private sector or to require bargaining with respect to wages or other money matters. *Cf.* RSA 31:3 (1970); 105-B:3 (Supp. 1973); *University of New Hampshire Chapter v. Haselton,* 397 F. Supp. 107 (D.N.H. 1975) (three-judge court). "[C]ollective bargaining on terms which substantially affect budget allocations and levels of service must be integrated with the budget-making process." Summers, *Public Employee Bargaining: A Political Perspective,* 83 Yale L.J. 1156, 1183 (1974). And as commented in Blair, *State Legislative Control over the Conditions of Public Employment: Defining the Scope of Collective Bargaining for State and Municipal Employees,* 26 Vand. L. Rev. 1, 20 (1973): "Of course, it is unlikely that any state legislature would be willing to authorize either state executive officials or local governments to conclude final collective agreements with employee representatives over working conditions that require appropriations from state tax moneys, nor has that alternative ever been seriously suggested."

We are of the opinion that the defendants were not delinquent in the performance of their statutory duties in declining to negotiate concerning the "money matters" which the plaintiff sought to have considered. We note however that the circumstances will be substantially different under the provisions of Laws 1975, chapter 490 "relative to collective bargaining rights for public employees" which become effective on August 23 and December 21, 1975.

## II.

A second issue presented is whether RSA ch. 98-C (Supp. 1973) required negotiations with respect to an agency shop as a "condition of employment". Briefly stated, an agency shop arises when nonmembers of the employee representative organization are, under penalty of discharge, required to contribute to its financial support. *See Tremblay v. Berlin Police Union,* 108 N.H. 416, 237 A.2d 668 (1968). The purpose behind such a requirement is to eliminate the "free riders", who reap the benefits of negotiation without sharing in the expense. *See* Hopfl, *The Agency Shop Ques-*

*tion,* 49 Cornell L.Q. 478, 479-80 (1964); *Comment, Impact of the Agency Shop on Labor Relations in the Public Sector,* 55 Cornell L. Rev. 547 (1970).

The most important indication of legislative intent appears in the inclusion of a so-called "right-to-work" provision in 98-C:2 (Supp. 1973) which protects the rights of employees to refrain from forming, joining and assisting any employee organization, and is typical of legislation in many other States. A majority of cases which have considered the question stand for the principle that an agency shop cannot coexist with a right-to-work law. *Farrigan v. Helsby,* 68 Misc. 2d 952, 327 N.Y.S.2d 909, 912 (Sup. Ct. 1971), *aff'd,* 42 App. Div. 2d 265, 346 N.Y.S.2d 39 (1973); *N.J. Turnpike Emp. Union v. N.J. Turnpike Auth.,* 123 N.J. Super. 461, 467-70, 303 A.2d 599, 603-04 (App. Div. 1973), *aff'd per curiam,* 64 N.J. 579, 319 A.2d 224 (1974). *See also Ficek v. International Bhd. of Boilermakers,* 219 N.W.2d 860 (1974). In the only case allowing an agency shop notwithstanding a right-to-work provision, the Supreme Court of Rhode Island saw no clear legislative objective behind the provision (R.I. Gen. Laws § 28-9.3-7) and on the contrary found it "manifestly inequitable to . . . be allowed a 'free-ride'". *North Kingstown v. Teachers Ass'n,* 110 R.I. 698, 706, 297 A.2d 342, 346 (1972). However, unlike RSA 98-C:2 (Supp. 1973) and the New Jersey and the New York statutes, the Rhode Island statute protected only the right not to "join" as opposed to the right not to "join and assist", and hence the case is not directly on fours with the instant one. However advantageous the establishment of an agency shop might have been in promoting negotiations under our statute, RSA 98-C:2 (Supp. 1973) and 98-C:7 (Supp. 1973), together with the weight of authority, indicate that the legislature thought otherwise.

### III.

The third issue raised by the petitions is whether compulsory arbitration is a mandatory negotiable "condition of employment" to offset RSA 98-C:4 II's (Supp. 1973) requirement of a "no-strike" provision in each labor contract. The plaintiff argues that some *quid pro quo* must be implied for the prohibition against strikes and that submission of impasse issues to binding arbitration would provide the most effective safeguard against abuses. *But see, e.g.,* Wellington and Winter, *Structuring Collective Bargaining in Public Employment,* 79 Yale L.J. 805, 833 (1970); Bernstein,

*Alternatives to the Strike in Public Labor Relations,* 85 Harv. L. Rev. 459, 466-67 (1971). The proposed RSA ch. 98-C (H.B. 347 (1967)), including the no-strike clause, was referred to the Legislative Council for study. 2 N.H.H.R. Jour. 1475-76 (1967). The report of the council is instructive. *See Coltin Co. v. Manchester Savings Bank,* 105 N.H. 254, 256, 197 A.2d 208, 210 (1964). "The Council favors inclusion of a 'no strike' clause . . . . A requirement that all arbitration be binding was not included since it was the opinion of the Council arbitration could not be binding if it required an appropriation or a change in the law." Report of the N.H. Legislative Council to the General Court, 1969 Session, at 55-56 (1968). Since the recommended no-strike clause was in fact included in RSA 98-C:4 (Supp. 1973) as finally passed, with no corresponding requirement for compulsory arbitration, it is evident that the legislature approved the council's view.

*Remanded.*

All concurred.