UNITED STATES of America, Appellee,

v.

Richard STEELHAMMER, Appellant.

UNITED STATES of America, Appellee,

v.

Andrew GALLAGHER, Appellant.

Nos. 75–2178, 75–2179.

United States Court of Appeals, Fourth Circuit.

Argued June 9, 1976.

Decided July 22, 1976.

---

Roger W. Tompkins, Charleston, W. Va. (Stone, Bowles, Kauffelt, & McDavid, Charleston, W. Va., on brief), for appellants.

Larry L. Simms, Washington, D. C., for the Reporters Committee for Freedom of the Press as amicus curiae.

Wayne A. Rich, Jr., Asst. U. S. Atty., Charleston, W. Va. (John A. Field, III, U. S. Atty., and Frank E. Jolliffe, Asst. U. S. Atty., Charleston, W. Va., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, WINTER, Circuit Judge, and KUNZIG, Judge, United States Court of Claims.*

ALBERT V. BRYAN, Senior Circuit Judge:

Newsreporters appeal their commitment of six months imprisonment for contempt of the District Court in refusing to obey its direction to answer questions of the prosecuting counsel when called to the stand as witnesses under subpoena in a civil contempt trial. They urge vacation of the judgment on the ground that it has deprived them of the protection of a qualified privilege vested in them by the First Amendment, to gather news and so inform the public on matters of public concern.

The rationale of their argument is that if a reporter is compelled to testify to what he has observed or heard while present at a rally or meeting of persons assembled to discuss problems peculiar to their interests, but also of general concern, then thereafter, in retaliation, the sponsors of the occasion will in all probability bar them from later gatherings. The consequence will be injurious to the rank and file of the people, we are told, through their losing such advantages as might accrue to them from this information—that the upshot is an abridgement of the Amendment's guarantee of "freedom of speech, or of the press." [1]

The District Judge was sensitively solicitous of the reporters' claims, evincing his solicitude in repeated offers of suspension of the impending penalty if the appellants would break their silence. He endeavored in every way consistent with his sense of bounden obligation to uphold the sovereignty of a Federal court decree and yet accord them leniency in their predicament. He was unsuccessful in his efforts. In the confrontation the appellants again and again avowed with unquestionable sincerity, their innocence of any contempt, the while religiously seeking absolution through the creed of freedom of the press. It was not defiance of authority, but rather a steadfast fidelity to a precept of their profession.

Our resolution of his clash of convictions of minds and consciences is to grant the prayer of the reporters, but on grounds less than their assertions. In this we do not devalue the stature of the Court's order, for

---

* Sitting by designation.

1. First Amendment: "Congress shall make no law . . . abridging the freedom of the press . . . ." A coordinate safeguard is written in the Fourteenth Amendment: ". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . ."

it is evident that the District Judge was prompted solely by principle, after application and industry of study and thought. Indeed, it appears that he believed he had no other course. Our decision is by way of an accommodation of the two conflicting persuasions.

Now emphasized and repeated is that our determination is limited to the *circumstances of this case*. Among others, notably, it does not contemplate the contingency of the reporter being the sole or only competent witness to an incident. To begin with, it is conceded that the reporters had not acquired their knowledge through confidential communications. Further, the information could have been adduced for the Court through the testimony of any of many others. Our conclusion does not accord a privilege, absolute or qualified, to the reporter. Actually it is a privilege of the public. Its interest calls here for restraint in the judicial laying on of sanctions.

Decision now is but the product of a balancing of two vital considerations: protection of the public by exacting the truth versus protection of the public through maintenance of free press. The first consideration could have been accomplished without obstructing fulfillment of the latter—by relieving the reporters, on their protest, of their predicament and calling for testimony from others not similarly situated. Weighing in the scales in favor of this solution is its avoidance of unnecessary incurrence of any potential danger of sterilizing the sources of newsworthy items. Moreover, this course would, we feel, square with the Judge's understandable conception of his duty, for the search of the Court for the truth will not be thwarted.

To make these decisions we have steered by the terms and tenor of the highest court's pronouncements in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).[2]  A recital of the facts will provide an expository background for our holdings. At the suit of the Kanawha Coal Operators Association the Federal District Court in Charleston, West Virginia, on August 21, 1975, issued a temporary restraining order against the United Mine Workers of America, District 17, designed to prevent continuation of a wildcat strike. While the order was in effect, on August 24, 1975, in a union rally members Bruce Miller and Louis Delano purportedly advocated prolongation of the strike. A hearing, civil in nature, was held before the District Judge, September 8, 1975, to ascertain whether Miller and Delano had breached the Court's decree.

Appellants Andrew Gallagher and Richard Steelhammer, as reporters for the Charleston Gazette, had attended the rally and were summoned as witnesses to testify to the events they had observed, seen or written of at the contempt trial. Failing in attempts to quash the subpoenas, both of them refused to give evidence in response to interrogation by the prosecuting counsel, although they acknowledged that no confidences sealed their lips. The District Judge on September 8, 1975 adjudged them "in contempt of Court and [that they] will be held until further order of the Court, not to exceed six months."

An adjudication and sentence upon contempt was entered in compliance with the provisions of F.R.Crim.P. 42(a) prescribing the requisites therefor. The accused contemnors, as heretofore noted, declined to cleanse themselves despite the Court's several invitations for them to do so. Meanwhile several other journalists had responded to the same questions that Gallagher and Steelhammer had refused to answer. These are the whole facts and they are not in dispute.

---

2. Because this case does not involve judicial ban on publication of court proceedings or, as noted supra, involve a reliance by the reporters upon a right to protect confidential sources of information, no discussion is now included of the opinion of the Supreme Court in *Nebraska Press Ass'n, et al. v. Stuart, Judge, et al.,* —— U.S. ——, 96 S.Ct. 2791, 49 L.Ed.2d —— (1976) or of its denials of certiorari in *Rosato v. Superior Court of Fresno County,* —— U.S. ——, 96 S.Ct. 3200, 48 L.Ed.2d —— (1976) and *Farr v. Pitchess,* —— U.S. ——, 96 S.Ct. 3200, 49 L.Ed.2d —— (1976).

In argument before us mention was made of mootness of this case. It came about in discussion of whether the contempt charged to the appellants was criminal or civil. They averred it to be civil, and that since the citations against the strikers, i. e. Miller and Delano, were not still pending, no opportunity remained for them to absolve themselves. Hence, they insist, their conviction is no longer outstanding. *Shillitani v. United States*, 384 U.S. 364, 371, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). The prosecution disagrees. It characterizes the proceeding as criminal, relying on *Shillitani's* explanation that a criminal contempt judgment may also include like interim redemption conditions as in civil contempt. Indeed, it is said, pursuit initially of a civil contempt course is favored. Id. at 371, fn. 9, 86 S.Ct. 1531; *United States v. Wilson*, 421 U.S. 309, 316, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975). Seemingly, too, in either type of contempt the Court may appoint counsel to prosecute it, and here the United States Attorney was designated to do so. *Frank v. United States*, 384 F.2d 276 (10 Cir. 1967), aff'd 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 and rehearing denied 396 U.S. 869, 90 S.Ct. 34, 24 L.Ed.2d 123.

Finally, it is clear we shall not have to classify the contempt: whatever the category we conclude that the controversy is not moot. All parties desire this conclusion, too, because in the locality and industry of this dispute, a like kind of difficulty is altogether likely to arise from time to time with some frequency and, indeed, even among the same or similar actors. We agree. To invoke the doctrine of mootness would mean that the controversy would be "capable of repetition, yet evading review." *Vide*: *Nebraska Press Ass'n, et al. v. Stuart, Judge, et al.*, —— U.S. ——, 96 S.Ct. 2791, 49 L.Ed.2d —— (June 30, 1976); *Southern Pacific Terminal Co. v. I. C. C.*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). Accord: *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Carroll v. Princess Anne*, 393 U.S. 175, 178–179, 89 S.Ct. 347, 21 L.Ed.2d 325 (1969); *United States v.*

*W. T. Grant Co.*, 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

The judgments of contempt will be

VACATED.

WINTER, Circuit Judge (dissenting):

I respectfully dissent from the majority's holding.

In the instant case it is conceded that the reporters did not acquire the information sought to be elicited from them on a confidential basis; one of them (Steelhammer) so testified in the district court. My study of the record fails to turn up even a scintilla of evidence that the reporters were subpoenaed to harass them or to embarrass their newsgathering abilities at any future public meetings that the miners might hold. It therefore seems to me that, in the balancing of interests suggested by Mr. Justice Powell in his concurring opinion in *Branzburg v. Hayes*, 408 U.S. 665, 709, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the absence of a claim of confidentiality and the lack of evidence of vindictiveness tip the scale to the conclusion that the district court was correct in requiring the reporters to testify. These absences convert the majority's conclusion into a broad holding that journalists called as witnesses in civil cases have a privilege to refuse to testify about all events they have observed in their professional capacity if other witnesses to the same events are available, despite the avowal that the holding is limited to the facts of the case.

The only contentions advanced at the trial, in the briefs and at oral argument to support this broad result are to me factually or legally unacceptable. First, the journalists themselves argued from the witness stand that by testifying they would appear to the miners to be "taking sides," and would therefore incur the miners' enmity and lose their trust, "cutting their throats journalistically." To accept this reasoning it would be necessary to ignore the entire history of the origin of testimonial compulsion.

Early in the development of the common law, witnesses could not be compelled to appear. Indeed, they were discouraged from testifying in private disputes, for if they did so—voluntarily—they would be accused of attempting to influence the outcome in favor of the party whom their testimony helped, and could be subject to a suit for the tort of maintenance. While this situation appears strange today, it is more readily understandable if it is recalled that generally jurors and witnesses were the same persons.

It became apparent, however, that the fact-finding process suffered because of the unwillingness of potential witnesses with relevant information to make themselves available out of fear of being accused of maintenance. Thus, the concept of testimonial compulsion was evolved to solve the problem, according to the maxim, *"what a man does by compulsion of law cannot be called maintenance."* *See* VII J. Wigmore, Evidence, § 2190 at 63–65 (1961). Plainly, then, a modern witness does not "take sides" by testifying under court order, but rather performs his civic duty; and it is imperative that all citizens understand this principle. I would not readily charge the miners with ignorance of the journalists' obligations, nor would I presume that the miners would scorn the journalists for respecting these obligations.

Second, it is urged that notwithstanding the nonconfidential character of the information sought from the reporters, compelling them to testify about their observations at the miners' meetings would as a practical matter result in the closing of future meetings to outsiders and the exclusion of reporters, impeding the journalists' ability to gather news of the coal strike, in violation of the first amendment. Presumably, this action would be taken by the miners in order to render more difficult the coal operators' task in obtaining witnesses to use against them in further court proceedings.

While I can think of no logical reason to suppose that the journalists will be denied admission to secret meetings on a confidential basis because of the outcome of this case which does *not* involve confidential communications or observations,* even if the miners conclude to close future meetings to journalists, along with other outsiders generally, I do not think that any legal rights of the journalists would be violated. Of course, the journalists seize upon the Supreme Court's statement in *Branzburg v. Hayes*, 408 U.S. at 707, 92 S.Ct. at 2670, that "news gathering is not without its First Amendment protections" in support of their position, and argue that they have a first amendment right to be present and to report what transpires. But, whatever the implications of the *Branzburg* dictum may have been, they must be qualified in light of *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1964). In that case, journalists challenged a regulation of the California Department of Corrections which prohibited interviews with specific individual inmates by persons other than their lawyers, clergymen, relatives, and prior acquaintances. In upholding the regulation, the Court observed that it did not discriminate against journalists, but merely failed to afford to them a right lawfully withheld from other members of the public.

The Court quoted *Branzburg*, 408 U.S. at 784, 92 S.Ct. 2646, 2658, for the proposition that "[i]t has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally," and then went on to state its holding in the following unequivocal language:

The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to

---

* In my view the prerequisites to the establishment of a privilege against disclosure of communications set forth in VIII J. Wigmore, Evidence, § 2285 at 527 (1961) should apply to reporters. Under Federal Rules of Evidence 501, they should be afforded a common law privilege not to testify in civil litigation between private parties. I do not prolong this opinion by developing this point.

378

accord the press special access to information not shared by members of the public generally. It is one thing to say a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources, cf. *Branzburg v. Hayes*, supra, and that government cannot restrain the publication of news emanating from such sources. Cf. *New York Times Co. v. United States* [403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822] supra. It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision of this Court. Accordingly, since [the California prison regulation at issue] does not deny the press access to sources of information available to members of the general public, we hold that it does not abridge the protections that the First and Fourteenth Amendments guarantee. 417 U.S. at 834–35, 94 S.Ct. at 2810.

While expressing my dissent from the majority's holding as set forth above, I record that I do think that the majority is correct in addressing the merits. To my mind the district court proceeded in civil contempt. While the case is thus moot in the sense that the reporters have lost the ability to purge themselves, their contentions raise an important point difficult to advance at the appellate level before mootness ensues and likely to arise again in continuing litigation over the coal strike and other matters. I therefore agree wholeheartedly that the case falls within a well recognized exception to the mootness doctrine.