# LORETTA TOFANI v. STATE OF MARYLAND

[No. 7, September Term, 1983.]

*Per Curiam Order filed May 9, 1983.*

*Opinion filed September 16, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Kevin T. Baine,* with whom were *David E. Kendall, Steven A. Steinbach* and *Williams & Connolly, David A. Levin* and *O'Malley, Miles, Farrington & McCarthy* on the brief, for appellant.

*Kathleen Howard Meredith, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Robert C. Bonsib, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

*Amicus curiae* brief of The A. S. Abell Publishing Company filed. *Douglas D. Connah, Jr., Craig E. Smith, G. Stewart Webb, Jr.* and *Venable, Baetjer & Howard* on the brief.

Murphy, C. J., delivered the opinion of the Court.

## PER CURIAM ORDER

For reasons to be stated in an opinion later to be filed, it is this 9th day of May, 1983

ORDERED, by the Court of Appeals of Maryland, that the judgment of the Circuit Court for Prince George's County be, and it is hereby, affirmed with costs; and it is further

ORDERED that the mandate shall issue forthwith.

For reasons to be stated in an opinion later to be filed, Judges Eldridge and Davidson would reverse the judgment of the Circuit Court for Prince George's County.

The issue presented in this case is whether a newspaper reporter may be compelled, over asserted First Amendment and Maryland shield law privileges, to testify before a grand jury where sources of the information sought have previously been disclosed in articles published by the reporter in the newspaper. By per curiam order dated May 9, 1983, we resolved the issue in the affirmative. We now give our reasons for that determination.

Loretta Tofani is a reporter for the *Washington Post*. As a result of extensive interviews conducted with a number of persons, including jail inmates, former detainees, guards, officials and judges, Tofani published a three-part series in the Post on September 26-28, 1982. The series was entitled "Rape in the County Jail: Prince George's Hidden Horror." In graphic detail, the articles described twelve incidents of "male rape" and sexual assault in the county jail. Although Tofani did not personally witness any of the criminal activities described, she was given permission by both victims and assailants to identify them by name in her articles, which she did. As a result of the series, much public attention was focused on what had previously been a little known problem.

On September 29, 1982, the regular term of the April 1982 Prince George's County Grand Jury was extended to investigate the alleged crimes. On November 1, 1982, the grand

jury directed Tofani to appear before it as a witness, to be questioned about the authorship and accuracy of the published articles and, as to certain of the assailants, to verify the time, place, and substance of the reported conversations; and also to ascertain whether the conversations were memorialized or witnessed by others. Tofani moved to quash the summons, relying upon the Maryland shield law, Maryland Code (1980 Repl. Vol.), § 9-112 of the Courts and Judicial Proceedings Article, which provides:

> "A person engaged in, connected with, or employed on a newspaper or journal or for any radio or television station may not be compelled to disclose, in any legal proceeding or trial or before any committee of the legislature or elsewhere, the source of any news or information that was obtained by the person for purposes of publication in a newspaper or journal or for purposes of dissemination by a radio or television station where the person is engaged, connected with or employed."

Tofani also sought to quash the summons on the ground that, as a news reporter, she possessed a qualified First Amendment privilege not to testify before the grand jury.

The court (Ahalt, J.) denied the motion to quash. Although noting that the shield law made a reporter's sources privileged even without a promise of confidentiality, the court found that Tofani had waived the law's protection by publishing the names of her sources in the newspaper. Further, the court found no First Amendment newsgatherer's privilege before a grand jury, relying on the Supreme Court's decision in the consolidated cases reported as *Branzburg v. Hayes,* 408 U.S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972). The court entered final judgment on January 12, 1983, directing Tofani to appear before the grand jury. The judgment was stayed pending final disposition of Tofani's appeal. We granted certiorari prior to consideration of the appeal by the Court of Special Appeals to resolve the questions presented in the case.

## Maryland Shield Law

In 1896, Maryland became the first State to enact a "shield law," a statutory privilege which allows a newsgatherer to decline to reveal sources of information. The statute was prompted by a specific event: in early 1896, John T. Morris, a *Baltimore Sun* reporter, published an article suggesting that certain elected officials and policemen were on the payrolls of illegal gambling establishments. His article contained information practically identical to testimony received earlier by a grand jury investigating such corruption. Suspecting a leak, the grand jury summoned Morris and demanded to know his source. When he refused, he was imprisoned; he was released when the grand jury's term expired some five days later. The Journalists' Club, alarmed at the prospect of reporters having to choose between freedom and revealing the names of confidential sources, persuaded the General Assembly to enact protective legislation. *See* ch. 249 of the Acts of 1896, and B. Bortz & L. Bortz, *"Pressing" Out The Wrinkles In Maryland's Shield Law For Journalists*, 8 U. Balt. L. Rev. 461 (1979).[1]

Although Maryland's shield law has served as a model for other states which have enacted such laws, case law interpreting the statute has been sparse, especially considering its eighty-seven year history. In *State v. Sheridan,* 248 Md. 320, 236 A.2d 18 (1967), an investigative reporter for a national broadcast network was subpoenaed to testify before a Montgomery County grand jury and asked to reveal the details of his conversation with a source. Although Sheridan freely admitted the identity of his source to the grand jury, he asserted a "newspaperman's privilege" not to testify as to the information obtained, which the trial judge sustained. On appeal, we concluded that the issue was moot, since the grand jury's term had expired. We nevertheless said in dictum:

---

1. As originally enacted, the statute only covered print journalists; it was amended by ch. 614 of the Acts of 1949 to include radio and TV reporters.

> "Although [the trial judge] found as a fact, entirely justifiably we think, that Sheridan 'obtained certain information in the form of a conversation with Mr. Patrick *** [and] that he divulged the source of the conversation to the Grand Jury,' he sustained Sheridan's claim that his 'newspaperman's privilege' of never violating a confidence allowed him to remain silent as to the details of the information Patrick had given him, and dismissed the petition, somewhat inexplicably to us, since the statute makes inviolate only 'the source of any news or information' and not the 'news or information' itself." *Id.* at 321-22, 236 A.2d at 19.

The Maryland shield law was next considered in *Lightman v. State,* 15 Md. App. 713, 294 A.2d 149, *aff'd per curiam,* 266 Md. 550, 295 A.2d 212 (1972), *cert. denied,* 411 U.S. 951 (1973). In that case, Lightman, a reporter for the *Baltimore Evening Sun,* was summoned before a Worcester County Grand Jury to testify concerning illegal drug activities in Ocean City which, according to his published article, he had personally witnessed. Questioned as to the location of these illegal activities, Lightman refused to answer on the ground that such information would lead to disclosure of his sources in violation of the protection afforded by the shield law. He was cited for contempt and appealed. The Court of Special Appeals noted that, at common law, neither the reporter's source nor the information obtained was privileged. After discussing cases construing similar statutes in other jurisdictions, the court concluded that a promise of confidentiality was not necessary under the Maryland shield law to allow a newsman to protect his sources:

> "The statute, on its face, does not purport to protect a newsman from disclosing *only* such sources of news or information published by him that was received in the course of a confidential newsman-informant relationship. On the contrary,

while the Legislature may have enacted the statute with the primary purpose in mind of protecting the identity of newsmen's confidential sources, we think the statutory privilege broad enough to encompass any source of news or information, without regard to whether the source gave his information in confidence or not. Consequently, it is for the newsman to determine whether he will disclose the 'source' of his news or information, and such disclosure cannot be compelled by requiring that he answer questions aimed, directly or indirectly, toward ascertaining the source's identity."

*Id.* at 724-25, 294 A.2d at 156 (emphasis in original).

The court concluded that under the facts of the case *Lightman* was not protected by the shield law:

"Where a newsman, by dint of his own investigative efforts, personally observes conduct constituting the commission of criminal activities by persons at a particular location, the newsman, and not the persons observed, is the 'source' of the news or information in the sense contemplated by the statute. To conclude otherwise in such circumstances would be to insulate the news itself from disclosure and not merely the source, a result plainly at odds with the Maryland law espoused in dictum in *Sheridan.* We think *Sheridan* correctly interprets the Maryland statute, particularly since, being in derogation of the common law, it requires a strict construction."
*Id.* at 725, 294 A.2d at 156-57.

The court observed that, unlike the Maryland statute, the shield laws of some other states explicitly protect *information* obtained by a reporter as well as the *source* of the information. As to this, the court said:

"If the newsman's testimonial privilege is to be broadened, as in New York, to cover disclosure of

'any news or the source of any such news' . . ., it can
only be done by the Legislature." *Id.* at 726, 294
A.2d at 157.

In affirming the judgment in *Lightman,* we adopted the
opinion of the Court of Special Appeals.

In 1978, in response to an opinion request, the Attorney
General said that § 9-112 of the Courts Article, as then
worded, would not protect the source of information obtained
by a reporter where the information was not published. 63
Op. Att'y Gen. 325 (1978). The General Assembly subse-
quently amended § 9-112 to protect the reporter's source of
unpublished information. Proposed language in the amen-
datory act that would have created "an absolute privilege of
confidentiality as to any news or information or the source
of any news or information" obtained for publication was
deleted in favor of the narrower protection of the current
statute. *See* ch. 484 of the Acts of 1979.

The most recent case to construe the shield law is *Bilney
v. Evening Star Newspaper,* 43 Md. App. 560, 406 A.2d 652,
*cert. denied,* 286 Md. 743 (1979). There, six basketball
players at the University of Maryland sued several pub-
lishers and other individuals involved in writing and editing
stories which said that the players were in academic trouble
and subject to suspension from the team; the suit alleged
invasion of privacy and intentional infliction of mental
distress. Relying upon the Maryland shield law, the defen-
dants refused to identify the source of their information
respecting the players' academic records. The court rejected
a claim that the defendants had waived the shield law privi-
lege by referring to the source in the published article as
gratuitous or voluntary. It said:

> "Webster, Black, and the courts have defined
> 'waiver' in many different ways, but the common
> denominator of all the definitions is the
> relinquishment of a right, either directly or by
> acting in a manner that is inconsistent with the
> right or one's intention to rely on it. In this sense,

a reporter may, of course, waive the statutory privilege — perhaps unwittingly — in a variety of ways. But mere characterization of his source as gratuitous or voluntary is not one of them. Such a description does not suggest the source's identity (at least not in this case); nor is it inconsistent with a desire and intention not to reveal that identity." *Id.* at 570, 406 A.2d at 658.

In asserting that the trial judge erred in denying her motion to quash, Tofani relies upon the language of the statute that a journalist "may not be compelled to disclose, in any judicial proceeding . . . the source of any news." She contends that because the statute does not contain any provision that the privilege is inapplicable or is waived if the source of the news is disclosed by publication, such publication cannot effect a waiver of the privilege. Second, she asserts that the statutory purpose underlying the shield law is the unfettered dissemination of information to the public, and that this purpose would be frustrated if the privilege is deemed waived by the publication of a source's name. Tofani claims that sources would be less likely to consent to publication of their names in news articles if the protection afforded by the statute is thereby waived, with the result that articles such as Tofani's would lose much of their impact, credibility and value.

We are not persuaded by these arguments. The principle that the shield law protects only the source of the news and not the news itself was recognized and applied in *Lightman.* *Sheridan* implicitly indicates that voluntary disclosure of a source waives the statutory privilege notwithstanding the absence of an explicit provision in the statute pertaining to waiver. *Bilney* points out that waiver of the protection of the shield law may occur where the reporter acts in a manner that is inconsistent with the statutory privilege or the intention to rely upon it. Where, as here, the reporter voluntarily and intentionally revealed the names of her sources in published news articles, nothing remains to be protected under the statute. In other words, the public policy con-

siderations underlying enactment of the shield law, *i.e.,* to protect against the perceived harm that would result from compelling disclosure of a reporter's news sources, would not be served by sanctioning a reporter's refusal to reveal to the grand jury that which she has previously revealed to the public in published news articles. We think that the protection afforded a newsgatherer against compelled "disclosure" of a news source, in the ordinary and legal signification of that term, and in the sense used in the statute, goes no further than to inhibit the revelation, against the will of the reporter, of those sources not previously disclosed to the public.[2]

Tofani concedes that voluntary disclosure of a source in a judicial context would waive the privilege but not disclosure elsewhere. By selective use of ellipses in quoting the statute, she attempts to confine the waiver principle to the facts of *Sheridan.* The statute, however, prevents compelled disclosure "in any legal proceeding or trial or before any committee of the legislature *or elsewhere* . . . ." § 9-112 (emphasis supplied). Tofani suggests that a separate voluntary disclosure in each instance is required to effect a complete waiver. We disagree.

The narrow language of the statute and the legislature's refusal to broaden the scope of the shield to cover all information obtained for publication is inconsistent with the broad purpose claimed by Tofani. It is doubtful that many sources, willing to have their identity publicly disclosed in the media, would withdraw their cooperation unless the reporter could refuse to testify about the source. At most, it is likely that such a source would request anonymity, which would implicate the reporter's statutory privilege. Although a news item published without named sources might lack some of the "impact" it might otherwise have, it is difficult to see that this is a significant "fetter" to the free flow of

---

2. Of course, a promise of confidentiality to the source is not a prerequisite to invoking the protection of the statute. The privilege belongs to the reporter and he cannot be compelled to disclose the source of his news, whether it was given to him in confidence or not. *See Lightman, supra.*

public information, as claimed by Tofani. *Cf. People v. Wolf,* 39 A.D.2d 864, 333 N.Y.S.2d 299 (1972).

Other jurisdictions have considered waiver of a newsgatherer's privilege under statutes similar to § 9-112 of the Courts Article. Some statutes explicitly specify how a waiver may be effected, and cases decided thereunder are therefore not apposite. *See, e.g., People ex rel. Scott v. Silverstein,* 89 Ill. App. 3d 1039, 412 N.E.2d 692 (1980), *rev'd on other grounds,* 87 Ill.2d 167, 429 N.E.2d 483 (1981) (statutory divestiture provisions not met; informal private disclosure of sources to state's attorney did not effect waiver) (statute applies only to judicial disclosure); *In re Bridge,* 120 N.J. Super. 460, 295 A.2d 3 (1972), *cert. denied,* 410 U.S. 991 (1973) (disclosure of source and part of information in published article satisfied waiver statute). In *In re Taylor,* 412 Pa. 32, 193 A.2d 181 (1963), the Pennsylvania Supreme Court interpreted that state's shield law to protect not only the source of published information but the information itself (the notes, recordings and other details of the contacts with the source). The court there applied the principle that the privilege is waived when the information is published or publicly disclosed. 193 A.2d at 186. In *Saxton v. Arkansas Gazette Co.,* 264 Ark. 133, 569 S.W.2d 115 (1978), the court found no waiver when a reporter revealed the name of a person believed to be a source to her employer and to a prosecuting attorney, where it developed that the person was not in fact the source and the reporter had insisted that the purported source's name be kept confidential. In *People v. Wolf,* 39 A.D.2d 864, 333 N.Y.S.2d 299, *aff'ing* 69 Misc.2d 256, 329 N.Y.S.2d 291 (1972), the court noted

> "the information sought by the subpoena has been published and the source revealed. The statute therefore, cannot be used as a shield to protect that which has already been exposed to view." 333 N.Y.S.2d at 301.

In *In re Dan,* 80 Misc.2d 399, 363 N.Y.S.2d 493 (1975), the court found that the reporter had waived any privilege he

might otherwise have asserted by publicly disclosing his sources and part of the information obtained.[3]

As indicated in *Bilney,* there may be numerous ways by which the protection afforded to news reporters under the shield law may be waived. We hold that one clear-cut way is for the newsgatherer to publish the identity of her sources for public consumption.

Although not entirely clear from the record, we express doubt that the questions proposed to be asked of Tofani by the grand jury sought to establish the identity of her news sources. Those sources having been made public in Tofani's published articles, the grand jury presumably knew of their identities. As we already said, the identity of news sources, and not the information obtained from them, is subject to the statutory privilege. Thus, if the grand jury's purpose in calling Tofani as a witness was not directly or indirectly to seek the names of her news sources, the statute would have no application.

### The First Amendment

As an alternate ground for reversal, Tofani asserts that the trial judge failed to acknowledge and apply her "qualified reporter's privilege" under the First Amendment. To support her contention that there is such a privilege, Tofani places reliance upon a number of cases which she claims uphold, on First Amendment grounds, newsgatherers' refusal to testify either as to sources of information, or as to information gathered for publication.

Maryland has recognized that the right to gather news is protected by the First Amendment. *Sigma Delta Chi v. Speaker,* 270 Md. 1, 6, 310 A.2d 156, 159 (1973). *See also News American v. State,* 294 Md. 30, 447 A.2d 1264 (1982);

---

**3.** New York has also found a waiver where the *source* itself or a third party, rather than the reporter, reveals the source's identity. People v. Zagarino, 97 Misc.2d 181, 411 N.Y.S.2d 494 (1978); Andrews v. Andreoli, 92 Misc.2d 410, 400 N.Y.S.2d 442 (1977). *Accord,* CBS, Inc. v. Superior Court, 85 Cal. App. 3d 241, 149 Cal. Rptr. 421 (1978). We do not reach that issue here.

*Patuxent Publishing Corp. v. State,* 48 Md. App. 689, 429 A.2d 554 (1981). The only Maryland case to squarely consider a newsgatherer's First Amendment "privilege" was *Lightman v. State, supra.*[4] In that case, the reporter asserted that "it violates the free press and free speech guarantee of the federal and Maryland constitutions to compel a reporter to disclose the identity of a source, some of whose activities he has described in a newspaper article but whose identity he has fully protected." 15 Md. App. at 726. *Lightman* held flatly to the contrary, the court saying:

> "That no such violation of the federal constitutional guarantees exists in such circumstances has now been made clear by the Supreme Court of the United States in *Branzburg v. Hayes,* [408 U.S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972)]." *Id.*

In *Branzburg,*[5] the news reporters asserted claims which the Court summarized as follows:

> "that to gather news it is often necessary to agree either not to identify the source of information published or to publish only part of the facts revealed, or both; that if the reporter is nevertheless forced to reveal these confidences to a grand jury, the source so identified and other confidential sources of other reporters will be measurably deterred from furnishing publishable information, all to the detriment of the free flow of information protected by the First Amendment. Although the newsmen in these cases do not claim

---

4. In *Lightman,* the reporter also relied on Article 40 of the Maryland Declaration of Rights; the Court held that that article was *in pari materia* with the First Amendment. 15 Md. App. at 727. Tofani has not relied on the state constitution in this case.

5. Four cases were consolidated in the *Branzburg* appeal. Two involved a Kentucky reporter, Branzburg v. Pound, 461 S.W.2d 345 (Ky. 1971) and Branzburg v. Hayes and Meigs (an unreported decision of the Kentucky Court of Appeals); the third involved a Massachusetts reporter, In re Pappas, 358 Mass. 604, 266 N.E.2d 297 (1971); the fourth case was Caldwell v. United States, 434 F.2d 1081 (9th Cir. 1970), involving a California-based New York reporter.

an absolute privilege against official interrogation in all circumstances, they assert that the reporter should not be forced either to appear or to testify before a grand jury or at trial until and unless sufficient grounds are shown for believing that the reporter possesses information relevant to a crime the grand jury is investigating, that the information the reporter has is unavailable from other sources, and that the need for the information is sufficiently compelling to override the claimed invasion of First Amendment interests occasioned by the disclosure." 408 U.S. at 679-80.

The sole issue in the *Branzburg* cases, as stated by the Supreme Court, concerned "the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime." *Id.* at 682. As to this, the Court said:

"Citizens generally are not constitutionally immune from grand jury subpoenas; and neither the First Amendment nor any other constitutional provision protects the average citizen from disclosing to a grand jury information that he has received in confidence. The claim is, however, that reporters are exempt from these obligations because if forced to respond to subpoenas and identify their sources or disclose other confidences, their informants will refuse or be reluctant to furnish newsworthy information in the future. This asserted burden on news gathering is said to make compelled testimony from newsmen constitutionally suspect and to require a privileged position for them."
*Id.* at 682.

After noting that the First Amendment does not proscribe incidental burdens on the press, the Court cited prior cases which almost uniformly denied the existence of a newsgatherer's privilege not to testify before a grand jury or at trial. The Court observed that the grand jury has the dual

function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions. The Court noted the high place of grand juries in fair and effective law enforcement, stating:

> "Because its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad. 'It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime.' *Blair v. United States,* 250 U.S. 273, 282 (1919). Hence, the grand jury's authority to subpoena witnesses is not only historic, *id.,* at 279-281, but essential to its task. Although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that 'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege, *United States v. Bryan,* 339 U.S., at 331; *Blackmer v. United States,* 284 U.S. 421, 438 (1932); 8 J. Wigmore, Evidence § 2192 (McNaughton rev. 1961), is particularly applicable to grand jury proceedings."
> *Id.* at 688.

In unambiguous terms, the Court responded to the asserted First Amendment privilege:

> "Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that

other citizens do not enjoy. This we decline to do. Fair. and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." *Id.* at 689-91.

The Court was explicit in the reasoning behind its holding:

"The preference for anonymity of those confidential informants involved in actual criminal conduct is presumably a product of their desire to escape criminal prosecution, and this preference, while understandable, is hardly deserving of constitutional protection. ... Neither [the reporter nor the source] is immune, on First Amendment grounds, from testifying against the other, before the grand jury or at a criminal trial. The Amendment does not reach so far as to override the interest of the public in ensuring that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to all other persons. To assert the contrary proposition 'is to answer it, since it involves in its very statement the contention that the freedom of the press is the freedom to do wrong with impunity and implies the right to frustrate and defeat the discharge of those governmental duties upon the performance of which the freedom of all, including that of the press, depends. ... It suffices to say that, however

complete is the right of the press to state public things and discuss them, that right, as every other right enjoyed in human society, is subject to the restraints which separate right from wrong-doing.' *Toledo Newspaper Co. v. United States*, 247 U.S. 402, 419-420 (1918).

"Thus, we cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it." *Id.* at 691-92.

Where the reporter does not personally witness criminal activity, but rather obtains evidence of such activity through a confidential source, the Court weighed the claimed injury to First Amendment interests resulting from compelled grand jury testimony:

"There is little before us indicating that informants whose interest in avoiding exposure is that it may threaten job security, personal safety, or peace of mind, would in fact be in a worse position, or would think they would be, if they risked placing their trust in public officials as well as reporters. We doubt if the informer who prefers anonymity but is sincerely interested in furnishing evidence of crime will always or very often be deterred by the prospect of dealing with those public authorities char- acteristically charged with the duty to protect the public interest as well as his.

"Accepting the fact, however, that an undetermined number of informants not them- selves implicated in crime will nevertheless, for whatever reason, refuse to talk to newsmen if they fear identification by a reporter in an official inves- tigation, we cannot accept the argument that the public interest in possible future news about crime

from undisclosed, unverified sources must take precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future." *Id.* at 695.

Again, the Court's reasoning was clear and direct:

"[I]t is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy. . . . It is apparent . . . from our history and that of England, that concealment of crime and agreements to do so are not looked upon with favor. Such conduct deserves no encomium, and we decline now to afford it First Amendment protection by denigrating the duty of a citizen, whether reporter or informer, to respond to grand jury subpoena and answer relevant questions put to him." *Id.* at 696-97.

The Court also disposed of the reporters' claims "that preliminary to requiring their grand jury appearance, the State must show that a crime has been committed and that they possess relevant information not available from other sources, for only the grand jury itself can make this determination." *Id.* at 701. The Court said:

"The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it. To this end it must call witnesses, in the manner best suited to perform its task. 'When the grand jury is performing its investigatory function into a general problem area . . . society's interest is best served by a thorough and extensive investigation.' *Wood v. Georgia,* 370 U.S. 375, 392 (1962). A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every

proper way to find if a crime has been committed.'
*United States v. Stone,* 429 F.2d 138, 140 (CA2
1970). Such an investigation may be triggered by
tips, rumors, evidence proffered by the prosecutor,
or the personal knowledge of the grand jurors.
*Costello v. United States,* 350 U.S., at 362. It is only
after the grand jury has examined the evidence that
a determination of whether the proceeding will
result in an indictment can be made.

> 'It is impossible to conceive that in such cases
> the examination of witnesses must be
> stopped until a basis is laid by an indictment
> formally preferred, when the very object of
> the examination is to ascertain who shall be
> indicted.' *Hale v. Henkel,* 201 U.S. 43, 65
> (1906).

See also *Hendricks v. United States,* 223 U.S. 178
(1912); *Blair v. United States,* 250 U.S., at 282-283.
We see no reason to hold that these reporters, any
more than other citizens, should be excused from
furnishing information that may help the grand
jury in arriving at its initial determinations." *Id.* at
701-702.

While declining to find any conditional privilege, the Court
recognized that

> "news gathering is not without its First Amend-
> ment protections, and grand jury investigations if
> instituted or conducted other than in good faith,
> would pose wholly different issues for resolution
> under the First Amendment. Official harassment of
> the press undertaken not for purposes of law
> enforcement but to disrupt a reporter's relationship
> with his news sources would have no justification.
> Grand juries are subject to judicial control and sub-
> poenas to motions to quash. We do not expect courts
> will forget that grand juries must operate within
> the limits of the First Amendment as well as the
> Fifth." *Id.* at 707-708.

That the protections provided to newsgatherers by the First Amendment in a grand jury context are limited to preventing harassment or nonrelevant inquiries was reinforced by *Branzburg's* disposition of one of the consolidated cases (*In re Pappas*):

> "We affirm the decision of the Massachusetts Supreme Judicial Court and hold that petitioner must appear before the grand jury to answer the questions put to him, subject, of course, to the supervision of the presiding judge as to 'the propriety, purposes, and scope of the grand jury inquiry and the pertinence of the probable testimony.' 358 Mass., at 614, 266 N.E.2d, at 303-304." *Id.* at 709.

The concurrence of Justice Powell in the *Branzburg* opinion further emphasized the point:

> "[I]f the newsman is called [before the grand jury] to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.
>
> "In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection." *Id.* at 710.

Justice Powell was careful to distinguish the balancing endorsed by the Court from that advanced by his dissenting colleagues (and Tofani here):

"It is to be remembered that Caldwell asserts a constitutional privilege not even to appear before the grand jury unless a court decides that the Government has made a showing that meets the three preconditions specified in the dissenting opinion of Mr. Justice Stewart. To be sure, this would require a 'balancing' of interests by the court, but under circumstances and constraints significantly different from the balancing that will be appropriate under the court's decision. The newsman witness, like all other witnesses, will have to appear; he will not be in a position to litigate at the threshold the State's very authority to subpoena him. Moreover, absent the constitutional preconditions that Caldwell and that dissenting opinion would impose as heavy burdens of proof to be carried by the State, the court — when called upon to protect a newsman from improper or prejudicial questioning — would be free to balance the competing interests on their merits in the particular case. The new constitutional rule endorsed by that dissenting opinion would, as a practical matter, defeat such a fair balancing and the essential societal interest in the detection and prosecution of crime would be heavily subordinated." *Id.* at 710.[6]

It is clear that *Branzburg* expressly declined to create *any* testimonial privilege, absolute or conditional. Thus, Tofani's

---

6. The opinion of the Court, delivered by Justice White, was joined by Chief Justice Burger and Justices Rehnquist, Powell and Blackmun. Justice Douglas dissented in a separate opinion, as did Justice Stewart, joined by Justices Brennan and Marshall. Justice Powell filed what has been termed an "enigmatic" concurring opinion, 408 U.S. at 725. Although Justice Powell fully joined the majority opinion, *see id.* at 665, some courts and commentators (and Tofani here) have used his brief comments on "the limited nature of the Court's holding," *id.* at 709, to suggest that he really meant to join the dissenters in creating at least a conditional privilege. Such an interpretation is not supported by the *Branzburg* opinions.

assertion that the trial court misread *Branzburg* and erred in not upholding a qualified First Amendment privilege is simply incorrect. No case subsequent to *Branzburg* sanctions a reporter's refusal to testify before a grand jury investigating criminal activities on grounds other than those specified in *Branzburg. See Bursey v. United States,* 466 F.2d 1059 (9th Cir.), *rehearing denied,* 466 F.2d 1090 (1972) (providing protection against grand jury questions consistent with *Branzburg's* rationale); *In re Lewis,* 501 F.2d 418 (9th Cir. 1974), *cert. denied,* 420 U.S. 913 (1975) (subpoena requiring reporter to produce tapes and testify before grand jury justified by *Branzburg* criteria). In *In re Bridge,* 120 N.J. Super. 460, 295 A.2d 3 (1972), *cert. denied,* 410 U.S. 991 (1973), the court applied *Branzburg* in a bribery case where the grand jury sought to question a news reporter who broke the story and named his source in the article. *See also Lightman, supra,* and *compare Morgan v. State,* 337 So.2d 951 (Fla. 1976) (involving a reporter's refusal to testify before a grand jury in a noncriminal investigation into an apparent leak of sealed indictments).

It is true, as Tofani contends, that a number of courts have recognized a so-called "newsgatherers' privilege" based on the First Amendment. However, these cases do not support the claim of privilege made here; they involve very different situations (and correspondingly different conflicting interests) than are presented in this case. Some involve libel actions against newsgatherers who declined to identify news sources at trial. *See, e.g., Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir. 1980); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721 (5th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981); *Carey v. Hume,* 492 F.2d 631 (D.C. Cir.), *cert. denied,* 417 U.S. 938 (1974); *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972), *cert. denied,* 409 U.S. 1125 (1973); *Mize v. McGraw-Hill, Inc.,* 86 F.R.D. 1 (S.D. Tex. 1980); *Dow Jones & Company, Inc. v. Superior Court,* 364 Mass. 317, 303 N.E.2d 847 (1973); *Senear v. Daily Journal-American, Etc.,* 97 Wash.2d 148, 641 P.2d 1180 (1982) (First Amendment privilege question avoided by

creating common law privilege). Where the veracity of the newsgatherer's information is directly at issue, and particularly where actual malice must be shown, protection of confidential sources and the editorial process behind the publication has not been favored. *See Herbert v. Lando,* 441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979). Other cases involve civil or administrative actions in which a non-party journalist is called as a witness. *In re Petroleum Products Antitrust Litigation,* 680 F.2d 5 (2d Cir.), *cert. denied, Arizona v. McGraw-Hill, Inc.,* 103 S. Ct. 215 (1982); *Zerilli v. Smith,* 656 F.2d 705 (D.C. Cir. 1981); *Riley v. City of Chester,* 612 F.2d 708 (3d Cir. 1979); *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433 (10th Cir. 1977); *United States v. Steelhammer,* 539 F.2d 373 (4th Cir. 1976), *rehearing en banc,* 561 F.2d 539 (4th Cir. 1977) (civil contempt proceedings); *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir. 1972), *cert. denied,* 411 U.S. 966 (1973); *Maughan v. NL Industries,* 524 F. Supp. 93 (D.D.C. 1981); *Los Angeles Memorial Coliseum Com'n v. N.F.L.,* 89 F.R.D. 489 (C.D. Cal. 1981); *Application of Consumers Union of U.S., Inc.,* 495 F. Supp. 582 (S.D.N.Y. 1980); *Matter of Forbes Magazine,* 494 F. Supp. 780 (S.D.N.Y. 1980); *Gulliver's Periodicals, Ltd. v. Chas. Levy Cir. Co.,* 455 F. Supp. 1197 (N.D. Ill. 1978); *Altemose Const. v. Bldg. & Const. Trades Council,* 443 F. Supp. 489 (E.D. Pa. 1977); *Gilbert v. Allied Chemical Corp.,* 411 F. Supp. 505 (E.D. Va. 1976); *Apicella v. McNeil Laboratories,* 66 F.R.D. 78 (E.D.N.Y. 1975); *Loadholtz v. Fields,* 389 F. Supp. 1299 (M.D. Fla. 1975); *Democratic National Committee v. McCord,* 356 F. Supp. 1394 (D.D.C. 1973); *Connecticut State Bd. of Labor Relations v. Fagin,* 33 Conn. Sup. 204, 370 A.2d 1095 (1976) (administrative hearing); *Winegard v. Oxberger,* 258 N.W.2d 847 (Iowa 1977), *cert. denied,* 436 U.S. 905 (1978); *Taylor v. Miskovsky,* 640 P.2d 959 (Okla. 1981); *Dallas Oil & Gas, Inc. v. Mouer,* 533 S.W.2d 70 (Tex. Civ. App. 1976). Courts have been much more willing to protect newsgatherers in this context than where the newsgatherer is the target of a libel suit. Still other cases pit a criminal defendant's Sixth Amendment right to compel testimony against the

newsgatherer's First Amendment interests. *United States v. Burke,* 700 F.2d 70 (2d Cir. 1983), *U.S. appeal pending; United States v. Criden,* 633 F.2d 346 (3d Cir. 1980), *cert. denied, Shaeffer v. United States,* 449 U.S. 1113 (1981); *United States v. Cuthbertson,* 630 F.2d 139 (3d Cir. 1980), *cert. denied, Cuthbertson v. CBS, Inc.,* 449 U.S. 1126 (1981); *United States v. Pretzinger,* 542 F.2d 517 (9th Cir. 1976); *United States v. Blanton,* 534 F. Supp. 295 (S.D. Fla. 1982); *United States v. Hubbard,* 493 F. Supp. 202 (D.D.C. 1979), *cert. denied,* 102 S. Ct. 1971 (1982); *United States v. Orsini,* 424 F. Supp. 229 (E.D.N.Y. 1976), *aff'd,* 559 F.2d 1206 (2d Cir.), *cert. denied,* 434 U.S. 997 (1977); *United States v. Liddy,* 354 F. Supp. 208 (D.D.C. 1972); *State v. Sandstrom,* 224 Kan. 573, 581 P.2d 812 (1978), *cert. denied, Pennington v. Kansas,* 440 U.S. 929 (1979); *State v. Siel,* 122 N.H. 254, 444 A.2d 499 (1982); *Matter of Farber,* 78 N.J. 259, 394 A.2d 330, *cert. denied, New York Times Co. v. New Jersey,* 439 U.S. 997 (1978); *People v. Marahan,* 81 Misc.2d 637, 368 N.Y.S.2d 685 (1975); *Matter of McAuley,* 63 Ohio App. 2d 5, 408 N.E.2d 697 (1979); *Brown v. Commonwealth,* 214 Va. 755, 204 S.E.2d 429, *cert. denied,* 419 U.S. 966 (1974); *State v. St. Peter,* 132 Vt. 266, 315 A.2d 254 (1974); *Zelinka v. State,* 83 Wis.2d 601, 266 N.W.2d 279 (1978). A few cases have concerned the court's right to compel a reporter to testify about suspected leaks of sealed or otherwise protected information from criminal trials. *Farr v. Pitchess,* 522 F.2d 464 (9th Cir. 1975), *cert. denied,* 427 U.S. 912 (1976); *Rosato v. Superior Court,* 51 Cal. App. 3d 190, 124 Cal. Rptr. 427 (1975), *cert. denied,* 427 U.S. 912 (1976).

At most, these cases establish the principle that when an important interest, such as the First Amendment right to gather news conflicts with other important constitutional interests, courts must carefully consider and balance the competing interests in resolving the controversy. Cases which balance interests other than those involved in this case simply are not dispositive and can be analogized only with the greatest caution. Manifestly, the First Amendment issue in the present case is controlled by *Branzburg* and *Lightman.*

Tofani seeks to avoid the holding of *Branzburg* and *Lightman* by an alleged factual distinction, namely that unlike several of the reporters in *Branzburg* and the reporter in *Lightman*, Tofani did not personally observe any criminal conduct. It is difficult to see how this distinction makes a difference. In the Massachusetts case, *In re Pappas*, considered in *Branzburg*, there was no indication that the reporter had actually observed any criminal conduct. Certainly the breadth of the Supreme Court's holding would cover testimony about admissions of criminal conduct as well as criminal conduct observed. The reasoning of the Court was not dependent on observed criminal conduct, but rather included "situations where a source is not engaged in criminal conduct but has information suggesting illegal conduct by others." 408 U.S. at 693. Surely if the Supreme Court was unwilling to protect a source who had not personally engaged in criminal conduct, it defies logic to contend that it would protect a self-confessed criminal, as here.

Tofani has not asserted that the grand jury in this case is acting in bad faith, or is attempting to harass her or is making nonrelevant inquiries outside the scope of legitimate law enforcement needs. We therefore reaffirm the holding in *Lightman* that a newsgatherer called before a grand jury investigating criminal matters may not, on First Amendment grounds, refuse to appear and answer questions, absent a showing that the grand jury is acting in other than good faith or outside the legitimate scope of its inquiry. In so concluding, we find it difficult to envision that sources willing to be publicly labeled as self-confessed criminals would suddenly disappear if the First Amendment protection championed in this case was not forthcoming. As *Branzburg* notes, even though there may be some incidental burden on the free flow of information, it is surely outweighed by the vital, historic role played by grand jury investigation of criminal conduct.

In sum, we find that Tofani is not insulated from appearing before the grand jury by either the Maryland shield law or the First Amendment.