JOHN D. BILNEY ET AL. *v.* THE EVENING STAR
NEWSPAPER COMPANY ET AL.

[No. 21, September Term, 1979.]

*Decided October 15, 1979.*

The cause was argued before THOMPSON, WILNER and WEANT, JJ.

*Clarence W. Sharp* and *Walter H. Madden,* with whom were *Thomas D. Murphy* and *Madden & Murphy* on the brief, for appellants.

*Stuart F. Pierson,* with whom were *James A. McGuire* and *Verner, Liipfert, Bernhard & McPherson* on the brief, for appellees The Evening Star Newspaper Company, James Bellows, Richard Heller, Eric Blum and Theodore Beitchman. *Edward J. Smith, Jr.,* with whom were *David H. Martin* and *Santarelli & Gimer* on the brief, for appellees Mark Kram and Richard Burke. Submitted on brief by *Carl E. Tuerk, Jr.,* and *Cooper, Beckman & Tuerk* for other appellee.

WILNER, J., delivered the opinion of the Court.

Appellants are six young men who, in 1977, were undergraduate students at the University of Maryland (College Park Campus) and members of the University's varsity basketball team. Feeling aggrieved by articles appearing in the November 1, 1977, editions of the Washington *Star* and the student publication, the *Diamondback,* they sued the publishers of those newspapers and a number of individuals who allegedly participated in the writing and editing of the articles for invasion of privacy and intentional infliction of mental distress. The Circuit Court for Prince George's County entered summary judgment in favor of all defendants save one, which it dismissed on motion raising preliminary objection; and this appeal followed.

A few basic facts will put the issues raised here in the proper perspective. College basketball, particularly at the University of Maryland, is a "big time" sport. It generates a great deal of interest and excitement, not only among the students but among sports enthusiasts in most of the

Baltimore-Washington megalopolis and, indeed, because of the team's frequent national ranking, among sports-minded people throughout the country. It also generates a lot of money — legally for the University and the Atlantic Coast Conference, of which the University is a member, and illicitly for those who wager on college sporting events. Newspapers in the area follow the team's prospects and achievements with great interest and regularity.

The interest in the team, of course, spills over to the individual players. Their recruitment by the University and their individual performances as team members are given wide publicity, much of which is initiated or controlled by the University and its officials. Appellants, in their brief, concede that, by virtue of their status as members of the basketball team, they were "public figures" — that, as team members they were the subject and object of widespread public interest.

Pursuant to certain regulations adopted by the National Collegiate Athletic Association and the University of Maryland, students at the University who have completed 45 credits must maintain a grade-point average of 1.95 or above (essentially equivalent to a C-) and must earn at least 24 "quality points" per semester.[1] Failure to meet these standards will cause a student to be placed on academic probation; and, of central importance in this case, if a student is on academic probation in two consecutive semesters, he is subject to dismissal from the University. If dismissed, of course, he becomes ineligible to play on the school basketball team.

Each of these appellants was the recipient and beneficiary of an athletic scholarship, awarded by the University, that defrayed all or a major part of his college expenses. Academic success of a University athlete is encouraged and given wide publicity. The University publicly posts a list of all of its athletes earning a grade point average of 3.0 or better, and

---

1. Quality points are the product of the number of credits earned during the semester and the grade point value applicable to those credits. Thus, a student completing 12 credits in a semester must earn a "C" average, or a numerical average of 2.0 on a 4.0 scale (A=4, B=3, C=2, D=1) in order to satisfy both requirements.

it gives special publicity to those who achieve more notable success.

Thus it is that the academic prowess of these appellants, and their colleagues, was of significant public interest and concern not only in terms of the University's policy of encouraging scholastic success, but also from the perspective of their continuing eligibility to play varsity basketball.

On the morning of November 1, 1977, the Washington *Post* published an article quoting the University's basketball coach, "Lefty" Driesell, as admitting that four of the team's eight returning players were on academic probation for failing to meet grade requirements in the previous semester, and that two others had recently been taken off such probation. Although not directly identifying the four players, the article proceeded to permit their easy identification by a process of elimination. It named the eight veterans, stated that two — appellants Boston and Davis — had recently been taken *off* probation, and noted that two others, not involved in this case but who were named, were on the Atlantic Coast Conference honor roll. That, of course, left the four remaining appellants — Bilney, Bryant, Gibson, and Hunter — as those who were currently on probation. No action has been filed with respect to this article.

Later that morning, the *Star* printed two articles concerning appellants Bilney, Bryant, Gibson, and Hunter. Prominently displayed on page one were photographs of the four players, under which appeared their names and the statement: "The University of Maryland's basketball program is in danger of collapse because of poor schoolwork. The *Star* has learned that four of eight returning players— Larry Gibson, Jo Jo Hunter, Billy Bryant and John Bilney — are on academic probation and in danger of flunking." The full story appeared on the first page of the sports section. Under the by-line of appellee Dick Heller, identified as a *Star* "Staff Writer", the article recited that the *Star* had learned "from university records" that the four named players were "on academic probation and in danger of flunking" at the end of the fall semester. It went on to quote comments from Coach Driesell, Chancellor Gluckstern, Athletic Director

Kehoe, other University officials and faculty members, and former University basketball stars, all dealing either with appellants' particular dilemma or the general problem of satisfying minimum academic requirements. At the end of the article, it was noted that appellees Kram, Burke, and Blum "also contributed to this report." The second article in the *Star* was a column also under Heller's by-line that dealt primarily with Coach Driesell.

The third newspaper to comment on this matter was the *Diamondback*. On that same day — November 1 — in an article written by appellees Burke and Kram, it was again reported that Bilney, Bryant, Gibson, and Hunter were on probation and "in danger of being academically dismissed." More specifically, this article stated that "[a]ccording to records, Bilney finished last semester with a 1.5 grade point average, Bryant with a 1.24, Gibson with a 1.88 and Hunter with a 1.1". It said also that appellant Boston had been "academically dismissed" the previous spring, but had been reinstated, and that appellant Davis, while having a 2.2 grade point average, had been temporarily placed on probation for a quality point deficiency which was subsequently corrected.

Appellants named as defendants in their action the publishers of the *Star* and the *Diamondback* (appellees Evening Star Newspaper Company and Maryland Media, Inc.); the editor and sports editor of the *Star* (appellees Bellows and Beitchman); Richard Heller (the *Star* staff reporter); Eric Blum, a "stringer" for the *Star;* and the two authors of the *Diamondback* article who also were credited with contributing to the *Star* story (appellees Burke and Kram). The gravamen of their complaint, both in terms of the invasion of privacy and intentional infliction of mental distress counts, was that appellees wilfully, wrongfully, and maliciously invaded appellants' confidential University records and published private and privileged facts about their private lives. Both torts rested upon the unlawful obtention of confidential school records *and* the unlawful publication of such records.

Maryland Media, Inc. sought and obtained preliminary dismissal under Maryland Rule 323 on the basis of

eleemosynary immunity. For reasons shortly to be explained, it is not necessary for this Court to consider the propriety of that decision, although appellants have raised it as an issue in their appeal. After extensive discovery and the filing of voluminous affidavits, deposition transcripts, and other assorted documents, all other parties moved for summary judgment. Following a recorded oral argument, the court, as noted, denied the motion filed by appellants and granted those filed by appellees.

Appellants contend that this action was wrong for four reasons. As to appellees other than Maryland Media, Inc., they assert that summary judgment was inappropriate because (1) "there are genuine disputes as to material facts under [the] pleadings, affidavits and depositions", (2) the record did not support the court's conclusion "that appellees did not intentionally invade a private area of appellants' lives, which intrusion was unreasonably offensive", and (3) appellees had no right to publicize appellants' academic standing, even if appellants were public figures. The fourth issue is that of Maryland Media's charitable immunity.

## (1) Genuine Dispute of Material Fact

As noted, both appellants (collectively) and appellees moved for summary judgment, all asserting in support of their respective motions that there was no genuine dispute of material fact. Both sides filed answers in opposition to the other's motion, but neither answer asserted, as a defense to the opponents' motion, that there was a dispute of fact sufficient to require a trial of the issue.

At oral argument on the cross motions, appellants' counsel reiterated his contention that there was no genuine dispute as to any material fact and that no additional evidence was necessary, or would be forthcoming, with respect to the pending motions. It was agreed that the case was ripe for summary judgment, the only dispute being as to which side should be favored with the judgment.

Notwithstanding these assertions and concessions in the lower court, appellants claim here that there was indeed a

genuine dispute of fact sufficient to make summary judgment inappropriate. The dispute, they contend, is not with respect to any underlying or basic facts but rather in the inferences to be drawn therefrom. This, they say, is apparent from the memorandum opinion filed by the circuit court.

The uncontradicted evidence before the court, in the form of depositions and affidavits, was that (1) the poor scholastic showing on the part of a number of the varsity basketball squad members had been the subject of wide rumor around the Campus for some time; (2) Burke and Kram had heard these rumors and had reported them to the *Star;* (3) the *Star* indicated interest in the story if there was any foundation to it, and asked the two student reporters to check it out; (4) the ultimate information with respect to appellants' scholastic status was gratuitously given to Burke and Kram by a volunteer source whose identity, under the aegis of the Maryland Shield Law, Courts Article, § 9-112, they declined to reveal; and (5) Burke and Kram passed this information along to the *Star* and used it in their story in the *Diamondback.* Each of the appellees specifically denied under oath that he or it invaded the University records in order to obtain this information or solicited, employed or paid anyone else to do so. No direct evidence to the contrary — not even a conclusory averment under oath — was offered by appellants. From this uncontradicted evidence, therefore, it would seem clear that the information, though perhaps emanating *ultimately* from confidential University records, was not obtained by any personal act of invasion or intrusion on the part of any of these appellees.

The countervailing inference sought to be raised by appellants emanates from (1) the assertion in the *Star* article that the information was learned "from University records" and (2) the fact that Burke, Kram and Blum were paid a standard fee of $125 for their contribution to the story. These facts, they contend, permit an inference that the *Star,* through its employees, either invaded the University records directly or paid Burke, Kram, or Blum to do so on its behalf.

The short answer to this contention is that it was not preserved for appellate review. Although appellants argued

the existence of this inference below, their argument was solely in the context of their entitlement to summary judgment on the basis that there was no genuine dispute of material fact. At no point, either in their pleadings or in their oral or written argument to the circuit court, did they suggest that summary judgment for appellees would be inappropriate because of a dispute of fact generated by this proffered inference. It was therefore an issue that was not presented to or decided by the lower court, and we shall not consider it for the first time on appeal. Maryland Rule 1085.

We hasten to say that our conclusion in this regard is not based solely upon the fact that appellants filed their own motion for summary judgment. We need not determine here whether that alone would suffice to constitute a waiver of a subsequent argument that there existed a genuine dispute of material fact. *Compare Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138 (1970). As we have pointed out, in addition to the filing of such a motion and the consequent assertion to the lower court that there was no such dispute, appellants failed to raise this in opposition to appellees' cross motions and never presented the question in any way to the lower court. It is this combination of affirmative assertion with respect to their own motion and silence with respect to appellees' motion that has served to withdraw the question from appellate review.

### (2) Evidentiary Sufficiency: Conclusion That Appellees Did Not Intentionally Invade Appellants' Privacy In An Unreasonably Offensive Manner

In the section of its Memorandum Opinion dealing with the intrusion upon seclusion, the court stated that there was no showing that appellees "inspected confidential university files or solicited a third party to obtain the information". It concluded that "an unnamed source gratuitously" offered to secure and ultimately furnished the information to Burke and Kram, and held, as a consequence, that appellees "did not personally invade [appellants'] record nor was the manner in which they received the information offensive or objectionable to a reasonable man."

Appellants' attack on this conclusion is a multi-faceted one.

First, in a restatement of the argument discussed in part (1) of this Opinion, they proffer again the inferences sought to be drawn from the one phrase in the *Star* article referring to University records and the fact that Blum, Burke, and Kram were each paid $125. As presented here, however, we are not considering whether there was a dispute of fact, but only whether the evidence sufficed to support the findings made by the court that were contrary to those that appellants urge would flow from this inference. We have, in part (1), summarized the evidence offered by appellees as to the derivation of the two articles in question here; there is no need to repeat or expand upon it. Clearly the affidavits and depositions filed by appellees more than sufficed to support the findings reached by the court. Indeed, the evidence so offered was, save for the strained inference, uncontradicted, and could lead to no other findings.

Mixed in with their charge of evidentiary insufficiency is appellants' assertion that, having refused to reveal the identity of the initial source of the information, appellees may not properly rely upon the defense that this source was a voluntary and gratuitous one. No authority is cited for this proposition, and we know of none in support of it. For one thing, such an assertion fails to account for the important distinction among the various appellees. The evidence was, as noted, uncontradicted, that only Burke and Kram had any contact with this unnamed informant or knew who he or she was. Neither the *Star* nor its employees raised the State "shield" law in an effort to block appellants' discovery efforts; if their uncontradicted testimony is believed, they could not *disclose* the source because they didn't *know* the source. As to these appellees, therefore, the argument is without a factual predicate.

As applied to Burke and Kram, the argument raises another issue. During the pendency of these proceedings in the circuit court, Courts article, § 9-112 provided that a person connected with or employed on a newspaper "may not be compelled to disclose, in any legal proceeding ... the source of any news or information procured or obtained by

him for and published in the newspaper" with which he is connected.[2] In *Lightman v. State,* 15 Md. App. 713, 725 *affd.* 266 Md. 550 (1972), this Court (and through its adoption of our Opinion, the Court of Appeals) construed this statute as meaning that "it is for the newsman to determine whether he will disclose the 'source' of his news or information, and such disclosure cannot be compelled by requiring that he answer questions aimed, directly or indirectly, toward ascertaining the source's identity." In other words, the statute means what it plainly says.

Some courts, interpreting generally similar statutes, have drawn a distinction between criminal and civil cases, and have construed the privilege much more narrowly in the latter than in the former. *See, in general,* Annot., 7 A.L.R.3d 591, 598. Particularly in libel cases, a few courts have concluded that where a reporter testifies about some of his sources, or refers to his unnamed source as a "reliable" one, he has waived the statutory privilege. *See, for example, Brogan v. Passaic Daily News,* 123 A.2d 473 (N.J., 1956); *Beecroft v. Point Pleasant Printing & Publishing Co.,* 197 A.2d 416 (N.J., 1964).

It does not appear that the appellate courts of Maryland have yet considered these questions — whether the statute provides less protection to a reporter in a civil case, whether his characterization of an unnamed source as gratuitous or voluntary suffices to operate as a waiver and thereby withdraw the privilege entirely. We have them here, however, and we answer both in the negative.

The Maryland statute makes no distinction, either explicitly or implicitly, between civil and criminal actions; it applies to "any legal proceeding". Whatever arguments on the plane of public policy may be offered in support of a distinction — one way or the other — that policy has been clearly set and stated by the General Assembly; and we are not at liberty to create, on our own, a distinction for which there is no underlying basis in the law.

---

2. By Laws of Md., 1979, ch. 484, § 9-112 was amended to expand its protection to sources of information obtained for the purpose of publication, whether or not the information is actually published. The amendment, effective July 1, 1979, does not affect the outcome of or the issues involved in this appeal.

Neither do we so readily accept the theory of waiver as applied by some of our sister courts. Webster, Black, and the courts have defined "waiver" in many different ways, but the common denominator of all the definitions is the relinquishment of a right, either directly or by acting in a manner that is inconsistent with the right or one's intention to rely on it. In this sense, a reporter may, of course, waive the statutory privilege — perhaps unwittingly — in a variety of ways. But mere characterization of his source as gratuitous or voluntary is not one of them. Such a description does not suggest the source's identity (at least not in this case); nor is it inconsistent with a desire and intention not to reveal that identity.

The effect of endorsing appellants' argument as to Burke and Kram, on whatever theory, would be to penalize the use of the "shield" law and thus to negate the very protection sought to be conferred by the General Assembly. This, of course, we must decline to do.

Finally, appellants contend that "the bald allegation" that the ultimate source of the information was a gratuitous volunteer cannot stand as the basis for summary judgment without "valid proof" that appellees actually used such source in preparing the articles. The simple answer to this is that there was such proof. Indeed, that was the principal content of the evidence given by Burke and Kram.

### (3) Right to Publicize Scholastic Standing

We leave now the issues relating to the obtention of the forbidden information and consider the propriety of its publication in the context of the tort of invasion of privacy.[3] Conceding that they were public figures — and that the information printed was true — appellants maintain that their scholastic status was a purely private matter unaffected by any public interest or concern.

---

3. Appellants' argument as to the propriety of *publishing* this information is couched solely in terms of whether the publication was an invasion of their privacy. They do not discuss whether such publication also amounted to an intentional infliction of emotional distress, and neither shall we.

That invasion of privacy would be recognized as a separate tort in Maryland and redress provided for its commission was first suggested by the Court of Appeals in *Carr v. Watkins,* 227 Md. 578 (1962). Although, at that time, more than 70 years had elapsed since the American nativity of the tort in the famous article by Warren and Brandeis (*The Right to Privacy,* 4 Harv. L. Rev. 193 (1890)) and the tort had already been recognized throughout most of the United States, there had yet to be reached any real concensus among courts and commentators as to its precise nature. The *Carr* Court observed only that it emanated from the right "to be let alone" and had a certain kinship with the tort of defamation. 227 Md. at 586.

In the years following *Carr,* however, a good bit of "fleshing out" and molding occurred, notably with the drafting and adoption of new sections 652A — 652I of the Restatement of Torts (2d), and the tort was given a more precise and standard description. When it next dealt with the matter, in *Household Fin. Corp. v. Bridge,* 252 Md. 531 (1969), the Court of Appeals recognized these later developments and, in general, blessed by adoption their product. *See also Hollander v. Lubow,* 277 Md. 47 (1976).

Restatement (2d), § 652A describes four ways in which one may tortiously invade the privacy of another. At issue here is the third of these methods — § 652A(2)(c) — "unreasonable publicity given to the other's private life, as stated in § 652D". Section 652D provides:

> "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
> 
> (a) would be highly offensive to a reasonable person, and
> 
> (b) *is not of legitimate concern to the public."*
> 
> (Emphasis supplied.)

Comment e to § 652D deals with "voluntary public

figures". Not all of it is relevant here, but this much, we think, is:

> "One who voluntarily places himself in the public eye, by engaging in public activities, or by assuming a prominent role in institutions or activities having general economic, cultural, social or similar public interest, or by submitting himself or his work for public judgment, cannot complain when he is given publicity that he has sought, even though it may be unfavorable to him. . . . *In such a case, however, the legitimate interest of the public in the individual may extend beyond those matters which are themselves made public, and to some reasonable extent may include information as to matters that would otherwise be private.*" (Emphasis supplied.)

The concept described in the emphasized portion of comment e is touched on in greater detail in comment h. That says, in relevant part:

> "Permissible publicity to information concerning either voluntary or involuntary public figures is not limited to the particular events that arouse the interest of the public. That interest, once aroused by the event, may legitimately extend, to some reasonable degree, to further information concerning the individual and to facts about him, which are not public and which, in the case of one who had not become a public figure, would be regarded as an invasion of his purely private life. . . .
>
> "The extent of the authority to make public private facts is not, however, unlimited. . . . In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own

sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. The limitations, in other words, are those of common decency, having due regard to the freedom of the press and its reasonable leeway to choose what it will tell the public, but also due regard to the feelings of the individual and the harm that will be done to him by the exposure. Some reasonable proportion is also to be maintained between the event or activity that makes the individual a public figure and the private facts to which publicity is given."

Our Court of Appeals summarized these principles most cogently in *Beane v. McMullen,* 265 Md. 585, 600 (1972) when it stated that "reasonableness under the facts presented is the determining factor." *See also Hollander, supra,* 277 Md. at 60.

Appellants achieved the status of public figures solely by virtue of their membership on the University basketball team. Their possible exclusion from the team — whether for academic or any other reason — was therefore a matter of legitimate public interest. Had they quit the team or withdrawn from the University, the public would be entitled to ask and to speculate as to the reasons for such action. That the threat of exclusion was academically based does not lessen the legitimacy of the public interest. Appellants were not in the same posture as other students, whose scholastic standing, in its entirety, was purely of private concern; when their standing reached the point of affecting their eligibility to play basketball for the University, the privacy of that status became somewhat attenuated. Publication of that eligibility-threatening status was not unreasonable and did not trample upon community mores. Having sought and basked in the limelight, by virtue of their membership on the team, appellants will not be heard to complain when the light focuses on their potentially imminent withdrawal from the team. We thus concur with the circuit court that, upon the undisputed evidence in this case, the publications in question did not constitute a tortious invasion of privacy.

574

(4) Eleemosynary Immunity of Maryland Media, Inc.

Having concluded that, under the facts present here, neither the obtention nor the publication of the information was tortious, there would be no liability on the part of Maryland Media, Inc. to appellants. Accordingly, judgment in its favor was properly entered, and it would make no difference whether that result was required also by reason of eleemosynary immunity.

*Judgments affirmed; appellants to pay the costs.*