Syd FISCHER and Australian Challenge for the America's Cup, Plaintiffs,

v.

Andrew McGOWAN and Newport Offshore Ltd., Defendants.

Civ. A. No. 83–0481 S.

United States District Court, D. Rhode Island.

April 13, 1984.

---

980

Decof & Grimm, R. Daniel Prentiss, Vincent T. Cannon, Providence, R.I., for plaintiffs.

Gunning, LaFazia & Gnys, Edward L. Gnys, Jr., Providence, R.I., for defendants.

Edwards & Angell, Deming E. Sherman, Jeffrey Schreck, Providence, R.I., for deponent.

## OPINION AND ORDER

SELYA, District Judge.

This is an appeal from an order of a United States Magistrate for this District compelling Bruce Stannard, a reporter for an Australian-based newspaper, to disclose the names of confidential sources upon whom he relied in authoring an article which appeared in the *Melbourne Age* on July 19, 1983.[1] Written at a time when the upcoming America's Cup finals had captured the imaginations and stirred the emotions of competitors and spectators alike, the column described in considerable detail some of the alleged financial woes which had befallen the sponsors of the twelve-meter yacht "Advance" (one of the prime contenders for the highly coveted trophy). The article, which was no doubt viewed as a juicy morsel in international yachting circles, attributed certain of the kernels of information contained therein to the defendant Andrew McGowan, the owner of a dockyard known as Newport Offshore, Ltd. ("Offshore"). It stated in substance that McGowan had confirmed that the Australian syndicate promoting Advance's challenge (Syndicate) was in arrears on an indebtedness of approximately $12,800 owed to Offshore; that repeated attempts to satisfy the debt had been unavailing; and that Offshore was contemplating the institution of legal action in an effort to effect collection. The article also described other aspects of what it painted, generally, as the Syndicate's deteriorating financial situation. Alan Payne, a marine designer whose handiwork had contributed to construction of the Advance, was named as the well-spring of some of this data. Much of the information, however, was not attributed to any particular source(s).

Following the publication of the story, the Syndicate and its project director, Syd Fischer, brought this defamation action against McGowan and Offshore in this court. Jurisdiction was premised on 28 U.S.C. § 1332.[2] In the course of pre-trial discovery, Stannard was deposed by the plaintiffs on September 8, 1983. During that deposition, numerous questions were propounded concerning the sources plumbed by Stannard in extracting the intelligence upon which the article was bottomed. In response to such probing, Stannard confirmed the accuracy of the statements attributing certain points in the article to McGowan and Payne, respectively, and disclaimed that McGowan was a source of any other portions of his information. Despite repeated interrogation with respect to the unattributed segments of the piece, however, Stannard declined specifically to name any other informants upon whom he

1. A copy of the article is, for ease in reference, annexed to this opinion as Appendix A.

2. These same plaintiffs also commenced an action for libel against Stannard in the Providence County Superior Court. *Fischer v. Stannard,* C.A. No. 83–3382. This multifariousness was caused, no doubt, by the fact that this court would lack jurisdiction over a suit between foreign nationals. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 790 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). An attempt to name Stannard as a defendant here would have destroyed diversity jurisdiction.

relied, claiming that such knowledge was privileged.[3]

The plaintiffs, disaffected with Stannard's reticence, moved for an order compelling answers to those questions concerning the identity of hitherto undisclosed sources. That motion was duly served upon the defendants, and notice thereof was given to Stannard. Only the deponent filed an objection thereto.[4] And, while plaintiffs' request was pending, the defendants climbed aboard the anti-Stannard bandwagon by filing their own motion to compel (a virtual replica of the plaintiffs' initiative). That motion was served only upon the plaintiffs; it was not brought to the attention of Stannard or his attorney in any way. The plaintiffs, predictably, did not object to the defendants' motion. It was, therefore, granted automatically by the clerk on December 27, 1983 under Local Rule 12(a)(2) of this court.

In the meantime, the plot continued to thicken. Plaintiffs' motion to compel was referred to a magistrate for determination under 28 U.S.C. § 636(b)(1)(A). The magistrate held a hearing at which all counsel (including Stannard's) appeared and were heard. Thereafter, on January 12, 1984, the magistrate issued a thoughtful memorandum (Memorandum) granting the relief requested by the plaintiffs and ordering Stannard to answer the disputed questions.[5] Stannard, however, did not learn of

the Memorandum until January 26, 1984.[6] At that time, Stannard's lawyer indicated that he would promptly prepare a notice of appeal and requested that the absence of earlier notice be brought to the attention of the court. Stannard filed this appeal on February 2, 1984, less than ten days after he first learned of the Memorandum.

Stannard requests that this court set aside the magistrate's order on the ground that it is clearly erroneous and contrary to law. Both the plaintiffs and the defendants, in a touching display of unanimity atypical of adversary litigation, join forces to urge, first, that the deponent has no standing to appeal; second, that his appeal is ineffectual as being out of time; third, that this issue is foreclosed by the mechanical granting of the defendants' unopposed motion to compel (*see* text *ante*); and fourth, that the Memorandum in any event correctly deciphers the applicable law. The matters at issue have been extravagantly briefed; and this court heard oral argument on February 13, 1984.

## I.

Before reaching the merits of the important constitutional and statutory issues raised by Stannard (if, indeed, it proves necessary to do so), the court must as a threshold matter traverse the procedural jungle presented by this dedalian record. In so doing, an attempt will be made to

3. Although Stannard adamantly refused to finger any sources other than McGowan and Payne (both of whom were disclosed as sources in the published work itself), he did on several occasions identify a general class of persons from whom he might have obtained information. For example, at one point during the deposition Stannard admitted that he had spoken with crew members of the Advance preliminary to penning the article. Deposition of Bruce Stannard (Sept. 8, 1983) (T.), at 65. At another juncture, he indicated that all of the sources "had [something] to do with the Advance Syndicate." T. 43.

4. Stannard's objection was accompanied by a supporting affidavit in which he stated, *inter alia,* that the disputed information was given to him in confidence. Stannard Affidavit ¶ 5.

5. Although dated January 12 and sent to counsel on that date, the court records reveal that actual

docketing of the Memorandum was not accomplished until January 20, 1984.

6. The magistrate's clerk, according to settled practice, *see* Fed.R.Civ.P. 5(a) and (b), sent notice of the Memorandum (which by its terms embodied the order), only to counsel of record. Since Stannard was not a party, his counsel (despite the filing of the objection and of a brief, and his appearance at oral argument) was not notified. And, neither plaintiffs' counsel nor defendants' counsel saw fit to communicate with Stannard's lawyer during the ten days next following the release of the Memorandum. While these facts do not appear with crystal clarity from the record, they have been confirmed by independent investigation and were not disputed by any party in interest at the hearing held before this court.

treat as a unit the series of snares and pitfalls mapped out by the appellees' first three lines of defense. But, this inquiry need not long detain the court.

■ The notion that Stannard is somehow estopped from litigating his rights by the granting of the defendants' motion to compel is ludicrous. The asseveration is phrased in declarative terms by the plaintiffs, in manner following:

Stannard's appeal from the Magistrate's order of January 12, 1984, is moot for the reason that the defendant, on December 7, 1983, filed its own motion to compel Stannard to answer questions posed by defendant's counsel at the deposition, which were refused on the same grounds as those relied on to refuse to answer the plaintiff's question. That motion was granted on December 27, 1983, and no appeal was taken. That decision is now final. The instant appeal is an attempt to relitigate the same issues which have been finally determined by this Court. That determination is now the law of the case, and should not be disturbed.

Plaintiffs' Memorandum in Opposition to Appeal of Bruce Stannard (Feb. 10, 1984) at 1–2.[7]

This declamation stands naked as a newborn babe, unadorned by even a single citation to caselaw suggesting such a Draconian result. Such an omission is readily understandable, given the shaky footing upon which the appellees' position rests.

It is difficult to see how, consistent with fundamental fairness, Stannard could be bound by the December 27, 1983 order when (i) he was not a party to the case, nor in privity with any party, (ii) he received neither notice of the defendants' motion nor an opportunity to object or be heard, and (iii) he received no notification of the order emanating therefrom until well after all applicable appeal periods had expired.

In analogous situations, courts have consentiently rejected the idea that important rights can be eviscerated in such a casual fashion. *Cf. Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 480–81, 102 S.Ct. 1883, 1897, 72 L.Ed.2d 262 (1982) (collateral estoppel inapplicable where the party against whom the earlier decision is asserted did not have a "full and fair" opportunity to litigate the claim or issues); *Hansberry v. Lee*, 311 U.S. 32, 44–46, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940) (res judicata doctrine inapplicable where persons against whom judgment was invoked were not parties, nor in privity with any of the parties, to the suit in which the judgment was rendered).

And, this is especially true in a case such as this, where the putative bar arises not from judicial deliberation but from a temporary coincidence of interests between plaintiffs and defendants, culminating in ministerial approval of an unopposed motion. If the law is to have any meaning, parties to an action cannot collogue to twist the processes of the court to their mutual ends, impairing the rights of unseen third persons in the bargain. That is precisely why Fed.R.Civ.P. 37(a) provides, with regard to motions for orders compelling discovery, that "reasonable notice" must be given "to other parties *and* all persons affected thereby." (Emphasis added). The defendants, of course, wholly ignored the mandate of Rule 37(a) in the filing of their motion to compel; and the resultant order was, as to Stannard, rendered totally impotent by this oversight. Accordingly, the ipse dixit assertion of the appellees in this wise is as empty as a celibate's couch.

■ The arguments as to standing and timeliness are inextricably intertwined. Stannard maintains, with compelling force, that his ten-day period for appeal, *see* Fed.R.Civ.P. 72(a); Local Rule 32(b)(2),[8] did not

<hr>

7. The defendants sing a similar off-key tune. *See* Memorandum of the Defendants ... Re: Appeal of Bruce Stannard (Feb. 9, 1984) at 2–3.

8. Local Rule 32(b)(2) of this court provides:

Any party may appeal from a magistrate's determination made under this rule within 10 days after issuance of the magistrate's order, unless a different time is prescribed by the magistrate or a judge. Such party shall file

expire until ten days after being served with notice of the magistrate's order. Hence, Stannard reasons, since he did not receive any notice of the magistrate's order until January 26, 1984, his February 2 appeal was timely. The appellees counter on two fronts. They assert, first, that contrary to Stannard's averments, he was not entitled to receive notice of the Magistrate's order and thus cannot rely on the lack of notification to circumvent the ten-day period; and further, that the right to appeal conferred by § 636(b)(1)(A) and implemented by Fed.R.Civ.P. 72(a) and Local Rule 32(b)(2) cannot be exercised by a non-party such as the deponent. Stannard's rejoinder is that, while he "is not a party to the case, he is a party to [the] motion, since it directly affects his rights." Supplementary Memorandum on Timeliness of Appeal (Stannard) (Feb. 10, 1984) at 4.

Although the deponent was not a party to the litigation, it is beyond cavil that he was, as indicated above, a person "affected" by the motions to compel.[9] Since Fed.R.Civ.P. 37(a) therefore required that he receive "reasonable notice" of the motion itself, it follows inexorably that he was also entitled to receive "reasonable notice" of the ruling thereon, and to have reasonable access to judicial review of the magistrate's resultant edict. Such a concept is, after all, implicit not only in Rule 37(a), but in the provisions of Fed.R.Civ.P. 26(c) ("[u]pon motion ... by the person from whom discovery is sought, and for good cause shown, the court ... may make any order which justice requires to protect a party or person ..."); and indeed, in the clarion call sounded by Fed.R.Civ.P. 1

("[t]hese rules ... shall be construed to secure the just ... determination of every action.") And, inasmuch as no precise time is prescribed for the filing of such an appeal by a non-party, the court holds that such a filing must be made within a reasonable time. Cf. NAACP v. New York, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973) (timeliness of motion to intervene is an issue left to the sound discretion of the court, to be determined from all of the circumstances); Equal Employment Opportunity Commission v. United Airlines, Inc., 515 F.2d 946, 949 (7th Cir. 1975) (same). While the concept of what constitutes a "reasonable time" will usually be measured by the time alloted to a party for the same action, that need not invariably be the case. Given the concatenation of extraordinary circumstances at bar, this court has little difficulty in holding that the deponent's appeal was seasonable.[10] And, although supererogatory, the court, pursuant to Local Rule 32(b)(2), fixes and confirms the time for filing the appeal, nunc pro tunc, for purposes of this case, as being ten days from and after January 26, 1984. Further, mindful of the language of Rule 37(a), the court holds that Stannard, as an affected person, has standing to pursue the instant appeal.

In view of the foregoing, the court need not directly address Stannard's due process argument, insofar as it pertains to his right to be heard, cf. Mennonite Board of Missions v. Adams, —— U.S. ——, 103 S.Ct. 2706, 2711–12, 77 L.Ed.2d 180 (1983), nor his plea that the clerk's conduct perforce warranted an extension of the time within which to challenge the Memorandum. Cf.

with the clerk of court and serve on all parties a written notice of appeal which shall specifically designate the order or part thereof appealed from and the basis for objection thereto, and shall order a transcript of the proceedings thereon. A judge of the court shall consider the appeal and set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law.

9. Indeed, the appellees do not seriously suggest the contrary. On the facts of this case, one might as well ask the most familiar of rhetorical questions: "Is the Pope Catholic?".

10. It should be borne in mind that the Memorandum was not "filed" in the court records, see Fed.R.Civ.P. 5(e), until January 20, 1984. "Service" of the order was by mail. This, in itself, added three days to the delimited appeal period. See Fed.R.Civ.P. 6(e). Viewed in this light, Stannard's appeal was within the ten-day window of Local Rule 32(b)(2) even if his time began to toll when the Memorandum was placed on record.

*Mennen Co. v. Gillette Co.,* 719 F.2d 568, 570 (2d Cir.1983); Fed.R.App.P. 4(a)(5); Fed.R.Civ.P. 60(b).

## II.

Having cut a passable swath through the procedural jungle, the court now turns to the merits of the appeal. Stannard contends that the Memorandum, which compels him to reveal the identity of his undisclosed, confidential sources, is palpably wrong and contrary to the protections furnished by both the Rhode Island Newsman's Privilege Act, R.I.Gen.Laws §§ 9–19.1–1 *et seq.* (Act) and the First Amendment of the United States Constitution.

■ It is apodictic that the rulings of a United States Magistrate on non-dispositive pretrial discovery motions may only be overturned if they are clearly erroneous in fact or contrary to law. *Pascale v. G.D. Searle & Co.,* 90 F.R.D. 55, 59 (D.R.I.1981); 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a); Local Rule 32(b)(2). In measuring the magistrate's ruling by this yardstick, it makes eminent good sense to look first at the Act. It is a basic precept of federal jurisprudence that courts should eschew the needless resolution of constitutional questions if the pending case or controversy is susceptible to resolution on less sweeping state law grounds. *E.g., Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *In re Justices of the Supreme Court of Puerto Rico,* 695 F.2d 17, 22 (1st Cir.1982); *Lopez v. Bulova Watch Company, Inc.,* 582 F.Supp. 755, 762 (D.R.I.1984); *Belcher v. Mansi,* 569 F.Supp. 379, 382 (D.R.I.1983). If a mild exercise in sophomania may be excused, "[t]here is scant

warrant gratuitously to hold a farthing candle to the sun when necessity does not plainly demand such heroics." *Lopez,* 582 F.Supp. at 762. For this reason, the court will move directly to a consideration of Stannard's claims under the Rhode Island statutes.[11]

■ In passing the Act, the Rhode Island General Assembly plainly intended to respond to the legitimate needs of a free and dynamic press by according comprehensive safeguards to journalists and allied professionals against the compelled disclosure of confidential information and sources. Section 9–19.1–2 of the Act provides in pertinent part that

[e]xcept as provided in § 9–19.1–3, no person shall be required by any court, grand jury, agency, department, or commission of the state of Rhode Island to reveal confidential association, to disclose any confidential information or to disclose the source of any confidential information received or obtained by him in his capacity as a reporter, editor, commentator, journalist, writer, correspondent, newsphotographer, or other person directly engaged in the gathering or presentation of news for any accredited newspaper, periodical, press association, newspaper syndicate, wire service, or radio or television station.

As indicated in the text of § 9–19.1–2, the next following section of the statutory scheme qualifies this protection. Section 9–19.1–3 intones in relevant part that

(a) The privilege conferred by § 9–19.1–2 shall not apply to any information which has at any time been published, broadcast, or otherwise made public by the person claiming the privilege.

---

11. As the magistrate correctly noted, Memorandum at 2, the right to pre-trial discovery is delimited by the existence of privilege, *e.g.,* Fed.R.Civ.P. 26(b)(1); and, where (as here) the court sits in diversity jurisdiction, state law controls in the first instance as to the availability, nature and extent of applicable privileges. *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 724 (5th Cir.1980), *cert. denied,* 450 U.S. 1041 (1981); Fed.R.Evid. 501. All of the parties to this appeal (Stannard included) have briefed and ar-

gued the state law questions on the thesis that Rhode Island law applies; and therefore, the court is free to proceed on that assumption. *In re Pioneer Ford Sales, Inc. (Ford Motor Company),* 729 F.2d 27, 31 (1st Cir.1984); *Lopez,* 582 F.Supp. at 757 n. 1. Indeed, given the applicable state conflicts of law rules, *see Woodward v. Stewart,* 104 R.I. 290, 299–300, 243 A.2d 917, 923, *cert. dismissed,* 393 U.S. 957, 89 S.Ct. 387, 21 L.Ed.2d 371 (1968), the choice seems inevitable.

(b) The privilege conferred by § 9–19.-1–2 shall not apply (1) to the source of any allegedly defamatory information in any case where the defendant, in a civil action for defamation, asserts a defense based on the source of such information; or (2) to the source of any information concerning the details of any grand jury or other proceeding which was required to be secret under the laws of the state.

In sum, Rhode Island's shield law is a suit of journalistic armor, impenetrable not in all events and under any circumstances, but effective nonetheless so long as the silver bullets of § 9–19.1–3 do not strike.

 While there is no recorded legislative history underlying the Act, the court can take judicial notice, Fed.R.Evid. 201, of the fact that the Act became law in 1971, amidst mounting national concerns for safeguarding journalistic privilege and freedom of the press. A valuable public purpose is served by facilitating the ability of persons to talk unreservedly and in confidence to the media. Like the sweeping secrecy historically accorded as between attorney and client, physician and patient, priest and penitent, a free and vibrant democracy requires some suitable degree of prophylaxsis as between journalist and source. This is a case of novel impression; and, in the absence of any reported decisional law construing the Act emanating from the Rhode Island courts, this court, sitting in diversity jurisdiction, must attempt to forecast the interpretation that the state court would, if confronted by the issue, place on the statute. *E.g., Plummer v. Abbott Laboratories,* 568 F.Supp. 920, 921–22, 927 (D.R.I.1983). And, in so doing, the court may "assay sister state adjudications." *Id.* at 922. *See also Murphy v. Erwin-Wasey, Inc.,* 460 F.2d 661, 663 (1st Cir.1972).

There is no question but that Stannard is a "reporter .. directly engaged in the gathering or presentation of news ..." Thus, unless one of the three exceptions contained in § 9–19.1–3 applies, Stannard would be entitled to keep his own counsel concerning his classified sources. Unlike some other press shield schemes, *see, e.g.,* 42 Pa.Cons.Stat. § 5942, which leave the matter of waiver to the sometimes unpredictable fluctuations of the common law, the Rhode Island General Assembly has provided explicit guidance in § 9–19.1–3 with respect to whether, and if so, when, a journalist may be deemed to have forfeited his statutory privilege.[12]

 In the present case, the parties (plaintiffs and defendants) aver that the deponent relinquished his right to assert a privilege with respect to his undisclosed, confidential sources by (i) revealing the names of two other sources in the text of his article, (ii) answering deposition questions as to the extent of McGowan's cooperation, and (iii) mentioning several classes of persons from which his private sources might have been derived. Acknowledging that such disclosure does not fit within the express terms of either § 9–19.1–3(a) or § 9–19.1–3(b)(1), the magistrate nevertheless found that Stannard had abandoned any right to assert his statutory privilege. Memorandum at 5–7. He reasoned that to read § 9–19.1–3(a) as applying only to information which a journalist has actually made public, and not as precluding the assertion of a privilege where a newsperson reveals some, but not all, of his sources, would render that provision meaningless; and would, moreover, violate fundamental notions of fairness. *Id.* at 6–7. And, he read § 9–19.1–3(b)(1) as evidencing a "legislative intent that the Act not be

---

**12.** While §§ 9–19.1–3(a) and (b)(1) are not explicitly deemed to be "waiver" provisions, it is clear that their inclusion represents the legislature's selective adoption of two waiver themes frequently recognized at common law. For example, § 9–19.1–3(b)(1) essentially embodies the waiver concept set forth in *Brogan v. Passaic Daily News,* 22 N.J. 139, 123 A.2d 473 (1956), *overruled, Maressa v. New Jersey Monthly,* 89 N.J. 176, 194, n. 8, 445 A.2d 376, 385 n. 8, *cert. denied,* 459 U.S. 907, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). And, § 9–19.1–3(a) likewise iterates a theory of waiver which is firmly established in the caselaw. *See, e.g., Mazzella v. Philadelphia Newspapers, Inc.,* 479 F.Supp. 523, 529 (E.D.N.Y. 1979); *Maressa v. New Jersey Monthly,* 89 N.J. at 195, 445 A.2d at 386; *In re Taylor,* 412 Pa. 32, 44, 193 A.2d 181, 186 (1963).

used as a shield in defamatory cases." *Id.* at 6. This court, however, disagrees.

■ It is a staple of our jurisprudence that, where a legislative body has spoken on matters within its competence, the function of a court is to construe the language of the resultant pronouncement so as to give effect to the legislative intent. *United States v. American Trucking Association,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). And, although principles of common law may occasionally serve as guideposts in divining the direction of the loose use of words in a statutory scheme, a "statute's plain language is the primary indicator of its meaning." *Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.,* 545 F.2d 754, 756 (1st Cir.1976), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). *See also Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981); *United Nuclear Corp. v. Cannon,* 553 F.Supp. 1220, 1232 (D.R.I.1982). As stated with deathless sagacity by the Court more than a century and a half ago:

> [W]here the words of a law ... have plain and obvious meaning, all construction, in hostility with such meaning, is excluded. This is a maxim of law, and a dictate of common sense; for were a different rule to be admitted, no man, however cautious and intelligent, could safely estimate the extent of his engagements or rest upon his own understanding of law until a judicial construction ... had been obtained.

*Green v. Biddle,* 21 U.S. (8 Wheat.) 1, 89–90, 5 L.Ed. 547 (1823).

■ While it cannot be gainsaid that Rhode Island law requires statutes in derogation of the common law to be "strictly" construed, *Town of North Kingstown v. North Kingstown Teachers Association,* 110 R.I. 698, 703 n. 5, 297 A.2d 342, 344 n. 5 ((1972); *Hodge v. Osteopathic General Hospital,* 107 R.I. 135, 144, 265 A.2d 733, 738–39 (1970), strictness of construction need not be equated with emasculation: the construction of §§ 9–19.1-3(a) and (b)(1) which is urged by both the plaintiffs and the defendants (and which the magistrate accepted) is at irreconcilable odds with the plain language of these provisions.

■ As previously indicated, § 9–19.1-3(a) provides in straightforward terms that the privilege shall not apply to "any information which has at any time been ... made public ..." There is no hint that the provision was meant to provide for waiver as to anything other than the specific information disclosed—nor is there room for such a suggestion. Moreover, to apply this provision according to its terms would not, as the magistrate muses (Memorandum at 6), effectuate a meaningless tautology.[13] To the contrary, the firmly established theory which is the basis for § 9–19.1-3(a) is grounded on the bedrock truism that a permissive right is always subject to voluntary surrender by the party upon whom it is conferred. *See Bilney v. Evening Star Newspaper Co.,* 43 Md.App. 560, 570, 406 A.2d 652, 658 (1979). As the court in *Bilney* observed, "the common denominator of all the definitions [of waiver] is the relinquishment of a right, either directly or by acting in a manner that is inconsistent with the right or one's intention to rely on it." *Id.* There is nothing in this record which warrants an inference that Stannard at any time took action at variance with his present claim of privilege. No hint of waiver appears. Indeed, the article itself makes manifest a conscious decision—the journalistic reason for which is not for this court to question—to make public the identity of McGowan and of Payne, but to keep the identity of the scrivener's remaining sources in the bosom of the lodge.

And, the tenor of the statute flatly contradicts the strained ideas (i) that, by disclosing *any* source, Stannard waived his

---

**13.** As one example, this section would, on its face, impact scenarios such as existed in *Newburn v. Howard Hughes Medical Institute,* 95 Nev. 368, 594 P.2d 1146 (1979), a case in which a journalist attempted to rely on press shield law in refusing to give deposition testimony regarding matters which he had voluntarily disclosed during a previous discussion.

immunity as to disclosure of *all* sources, or (ii) that, by describing in generalities the population from which his hidden sources had been drawn, the deponent set into motion a chain of events which could not be braked short of spilling all of the beans. Neither Stannard's textual reference to McGowan and Payne (two apparently non-confidential sources) nor his generic description of classes of persons from which his informants could have been drawn, evidence any intent to surrender his right to preserve the anonymity of his auricular sources.

A clear majority of courts have held that the type of partial disclosure which occurred in the present case does not result in a finding of waiver. *E.g., Maressa v. New Jersey Monthly*, 89 N.J. at 194–96, 445 A.2d at 386 (general description of sources did not constitute waiver); *Resorts International, Inc. v. N.J.M. Associates*, 89 N.J. 212, 215–16, 445 A.2d 395, 397, *cert. denied*, 459 U.S. 907, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982) (disclosure of the names of approximately twenty sources did not waive privilege as to other information); *Saxton v. Arkansas Gazette Co.*, 264 Ark. 133, 136–37, 569 S.W.2d 115, 117 (1978) (disclosure of one source did not waive privilege as to others); *United States v. Capitol Service, Inc.*, 89 F.R.D. 578, 585 (E.D.Wis.1981) (identification of general population did not constitute waiver of informant's privilege as to any individual informant). And, the so-called "doctrine of completeness," urged by the defendants without meaningful citation of authority, cannot withstand the weight of these authorities.[14]

Turning to § 9–19.1–3(b)(1), that proviso, by its terms, does not apply to Stannard inasmuch as he is not the "defendant" in this suit. Moreover, Stannard's invocation of the statutory privilege confers no particular benefit upon him vis-a-vis the case at bar; his role *in the instant litigation* is that of a witness only. Thus, this is not a case like *Brogan v. Passaic Daily News, supra*, or *Anderson v. Nixon*, 444 F.Supp. 1195 (D.D.C.1978),[15] in which (because of what might aptly be characterized as an affirmative use of a privilege against disclosure), special considerations of fairness are implicated.[16] In the absence of such compelling circumstances the caselaw previously cited governs, and there is little justification to invoke the anfractuous reasoning which would be required to manipulate the statutory language towards the opposite result.

There is similarly no support for the conclusion that, by its passage of § 9–19.1–3(b)(1), the General Assembly evinced a pervasive disdain for the assertion of the statutory privilege in the context of defamation actions as a whole. The Act is of recent vintage; and this section is a carefully crafted provision obviously designed to apply to the type of factual situation with which the New Jersey Supreme Court was faced in *Brogan v. Passaic Daily News, supra*. *Brogan* involved a libel claim to which the defendant journalist asserted defenses of good faith and fair comment. In furtherance of those defenses, the reporter testified at trial, under direct examination, that he had based his article upon a conversation with a reliable informant; he also testified as to the substance of that dialogue. On cross-examination, the defendant refused to reveal the identity of his source, claiming a statutory privilege. Noting that

---

**14.** While not essential to decision of the issue at hand, the court does note the dichotomy between §§ 9–19.1–3(a) and 3(b); the former statute mentions only "information," while the latter deals with "the source" of information. It is, on this basis, at least arguable that § 9–19.1–3(a) is by definition unavailable as a wedge to force disclosure in a "source" case. But, the court leaves that fine distinction to another day.

**15.** In *Anderson*, the district court held that the initiation of a suit by a journalist would pretermit his right to assert a privilege against disclosure. 444 F.Supp. at 1200.

**16.** Whether the result would be different in respect to a deposition of Stannard noticed in the state court case, *see* n. 2 *ante*, where he is a defendant, is not for this court to determine.

[t]he position of the respondents in this case is that they insist on asserting these defenses based on the reliability of the source of information upon which they relied, yet refuse to disclose what those sources were, so that the jury could ascertain whether they were in fact reliable.

*Brogan v. Passaic Daily News*, 22 N.J. at 152, 123 A.2d at 480, the court held that where a defendant pleads a defense of good faith and further testifies that the libelous article was based upon a reliable source, the statutory privilege will be deemed to have been waived. *Id.*, 22 N.J. at 154, 123 A.2d at 481. The language of § 9–19.1–3(b)(1) precisely tracks the New Jersey Supreme Court's holding. The *Brogan* exception is, of course, inapposite here, inasmuch as Stannard is not a defendant in this suit; he is deposed not as a party who has asserted a good faith defense, but as a witness only. There is absolutely no basis for concluding that the General Assembly intended § 9–19.1–3(b)(1) to apply to defamation actions generally, or indeed to any situation other than that which was implicated in *Brogan*. *See Mazzella v. Philadelphia Newspapers, Inc.*, 479 F.Supp. at 529.

When all is said and done, the plaintiffs' and defendants' claims of unfairness are qualitatively no different from those which could be raised whenever an evidentiary privilege is invoked and a resultant inhibition of the fact-finding process occurs. As Justice Pashman of the New Jersey Supreme Court so thoughtfully observed, however,

[e]very libel law and every law affecting libel actions, including [a state's shield law], must balance important competing interests. We in no way seek to minimize the individual's interest in protection of his or her good name, which "reflects no more than our basic concept of the essential dignity and worth of every human being," *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597, 609 (1966) (Stewart J., concurring). But the Legislature has weighed the competing interests in a free press and the individual interest in reputation. It has chosen to give greater protection to freedom of speech and our duty is to enforce that choice.

*Maressa v. New Jersey Monthly*, 89 N.J. at 201–02, 445 A.2d at 389–90 (footnote omitted). *See also Mazzella v. Philadelphia Newspapers, Inc.*, 479 F.Supp. at 528–29. As in *Maressa*, this court (whether or not sympathetic to the predicament of the parties) has no choice but to effectuate the balance struck by the Rhode Island General Assembly and to follow exactly the letter of a well-drawn legislative enactment.[17]

### III.

At those crossroads of the law where the competing demands of a free press and of a fair trial intersect, the pavement is rarely smooth, the roadbed often ill-defined. The parties to this case would have the court simplify the choice by ceding the right of way in virtually all events to the exigencies of litigation. But, there are virtues which must, at times, overshadow the advantages of simplicity. As a society, we have long

---

17. Since the case at bar lends itself to disposition on state law grounds, it is neither necessary nor desirable for the court to reach the broader question as to Stannard's ability to keep secret the identity of his sources by reason of federal constitutional privilege. It should be noted, however, that while the existence of such a privilege cannot seriously be doubted, *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 594 (1st Cir.1980), it is far from an absolute. *E.g., Branzburg v. Hayes*, 408 U.S. 665, 690, 92 S.Ct. 2646, 2661, 33 L.Ed.2d 626 (1972). Its nature, scope, extent and vitality involve a delicate balancing of the concerns of the press and the parties in the context of the perceived need for plenary disclosure; and, *a fortiori*, the applicability of the First Amendment privilege in any given instance can be delineated only on a case-by-case basis. *Bruno & Stillman, Inc.*, 633 F.2d at 595. As Judge Coffin has so perceptively noted:

> [t]he important point ... is that courts faced with enforcing requests for the discovery of materials used in preparation of journalistic reports should be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights.

*Id.*

had a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open," *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.ct. 710, 721, 11 L.Ed.2d 686 (1964). We have recognized the salutary role of "an untrammeled press as a vital source of public information." *Grosjean v. American Press Co.*, 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936); *Riley v. City of Chester*, 612 F.2d 708, 714 (3rd Cir.1979). *See also Bruno & Stillman, Inc.*, 633 F.2d at 595–96 n. 12. And, we are keenly aware that a journalist's ability to assure potential sources that their identities will remain obscure invariably impacts upon the newsgathering process and the consequent dissemination of information to the public. *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C.Cir.1981); *Riley v. City of Chester*, 612 F.2d at 714; *Baker v. F & F Investment*, 470 F.2d 778, 782 (2d Cir.1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973).

The Rhode Island General Assembly arrived at this crossroads a decade ago. It mapped out a statutory path which rationally reflects the competing interests of newsperson and litigant, and which steers a steady course along the high road of principle. On the facts of this case, the clearly articulated policy of the Act controls and shields Stannard from the attempt to force him to reveal the identity of his confidential sources. The magistrate's January 12, 1984 order was erroneous and contrary to law, and the deponent's appeal from that ruling must be sustained. The plaintiffs' motion to compel is, accordingly, denied. And, since the order entered by the clerk on December 27, 1983 granting the defendants' motion to compel was a nullity, *see* text *ante* at 982–983, that entry is vacated and the defendants' underlying motion is also denied.

*It is so ordered.*

## APPENDIX A

**Dockyard sends Advance a final notice**

From Bruce Stannard

NEWPORT (Rhode Island), 19 July.—The Royal Sydney Yacht Squadron's America's Cup challenge has been threatened with legal action if it does not pay nearly $13,-000 in dockyard debts before the end of the week.

Andrew McGowan, vice-president of the Newport offshore dockyard, confirmed yesterday that the Sydney syndicate had, despite repeated warnings, consistently failed to pay bills amounting to $12,800.

McGowan said the debt for dockage fees, had been outstanding for more than a month.

He said the syndicate had received regular weekly warnings ever since. "They have until Thursday (Friday Melbourne time) to pay or we will be forced to take legal action against them," McGowan said.

That could include seizing certain properties including the Sydney boat, Advance, he said.

"We hope it won't come to that," McGowan said. "But if it does, we are prepared to act. The lawyers are just a phone call away.

"People who come here to challenge for the America's Cup ought to be able to pay their bills."

Advance has been plagued by a lack of finance ever since she was launched early this year. She was built on a shoestring budget and has never had sufficient funds for a proper America's Cup campaign.

In fact, Advance is in such severe financial straits that she has been unable to afford even the $400 cost of hauling out.

The America's Cup is a two-boat competition in which mere seconds often make the difference between first and last. All the racing yachts here, with the single exception of Advance, are therefore hauled out every night so that their crew can clean and polish their bottoms.

Advance has been out once, for just two hours, during the last month. The result is that barnacles have grown on her all-white aluminum hull. They are not the grotesque grey things you might see stuck to

the bottom of some old fishing trawler, but they are barnacles—or more accurately barnacle spores.

According to Advance's designer, Alan Payne, water flowing over the hull in its present condition would produce so much drag and turbulence that it could slow the boat down by as much as 10 boat-lengths over a 24.3 mile (39 kilometre) cup course in a five-to-seven knot breeze.

The Melbourne America's Cup syndicate offered the Advance crew the use of their own hydraulic hoisting facilities, but this apparently generous, and genuine, offer was turned down on the orders of the Advance syndicate's project director, Sydney businessman Syd Fischer.

The boat is to be hauled out of the murky waters of Newport harbor today so that she can be re-measured. The remeasurement is necessary because under the direction of Alan Payne, the Sydney crew have removed almost 450 kilos of loose lead from her forward sections.

The move is designed to lift the boat's head and hopefully improve her performance upwind and down. It is the only improvement Payne has been able to make to the boat since he arrived three days ago.

Taking lead out of the boat costs nothing. The truth is that the Advance syndicate is in no financial position to do anything else.

The syndicate is also in trouble with its Newport landlord. It came very close to eviction last week when it had insufficient cash to cover its monthly rent of $8125. It was forced, quite literally, to take in boarders.

The crews of two visiting Royal Canadian Navy Reserve patrol boats were given one entire floor in the three-story house after they handed over $8000.

Fischer arrives in Newport tomorrow night and a decision is then expected to be made on Advance's future.

A spokesman for the syndicate said in Melbourne that all dockyard debts had been paid. He refused to comment further.